UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

| | |
|---|---|
| HARKISHAN PAREKH, Derivatively on Behalf of CENTENE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL F. NEIDORFF, JEFFREY A. SCHWANEKE, ROBERT K. DITMORE, DAVID L. STEWARD, JOHN R. ROBERTS, TOMMY G. THOMPSON, FREDERICK H. EPPINGER, RICHARD A. GEPHARDT, ORLANDO AYALA, VICKI B. ESCARRA, PAMELA A. JOSEPH, K. RONE BALDWIN, and CAROL E. GOLDMAN, <br><br> Defendants, <br><br> -and- <br><br> CENTENE CORPORATION, a Delaware corporation, <br><br> Nominal Defendant. | ) Case No. <br> ) <br> ) <br> ) <br> ) VERIFIED STOCKHOLDER DERIVATIVE <br> ) COMPLAINT FOR VIOLATION OF <br> ) SECURITIES LAWS, BREACH OF <br> ) FIDUCIARY DUTY, WASTE OF <br> ) CORPORATE ASSETS, AND UNJUST <br> ) ENRICHMENT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Centene Corporation ("Centene" or the "Company") against certain of its officers and

directors for breaches of fiduciary duties and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to Centene's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Centene to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.        This action arises out of Centene's purchase of Health Net, Inc. ("Health Net"). Health Net was an insurance company that principally offered plans in California and Arizona. On July 2, 2015, Centene announced that its Board of Directors (the "Board") approved the Company's purchase of Health Net for $6.8 billion, including the assumption for $500 million in debt (the "Acquisition"). Defendant Michael F. Neidorff ("Neidorff"), Centene's Chairman, President, and Chief Executive Officer ("CEO") called the Acquisition a "significant next step in our strategy to increase scale and drive geographic and product diversification." Defendant Neidorff highlighted Health Net's "presence in California and other key western states."

3.        As would be subsequently revealed, however, Health Net's California exposure was not a strength, but actually a tremendous weakness. In 2014 and 2015, Health Net experienced a dramatic increase in claims, causing its liabilities to swoon. In particular, Health Net was losing millions of dollars on California plans where customers sought substantive abuse treatments. Before the Acquisition even closed, Health Net was taking drastic efforts to curtail these losses by unilaterally refusing to pay substance abuse treatment centers, despite contracts forcing them to do so. That practice continued after Centene completed the Acquisition in March 2016. As a result, substance abuse clinics stopped accepting patients that had Health Net insurance out of fear of getting stiffed on payments. Consequently, individuals that needed treatment were not receiving them.

4.     Defendants admitted that Health Net's California (and other western states) were a money-losing mess and that they had been taking wrongful actions to try to get out of them in a series of disclosures.  To start, on July 26, 2016, Centene announced that it was increasing its reserves by almost $400 million to account for Health Net's money-losing policies.  That same day, defendants also revealed that they knew about the California insurance plan problems before the Acquisition occurred.  In particular, defendant Neidorff admitted that "[t]his is something we inherited. And it was prior to the 24th [of March] when those things were set." Defendant Neidorff continued that he had "personally been involved in and pushing and discussing" changes to the policy plan design, as Centene had been "working with the states at the highest levels to redesign" the policies.  During a televised interview defendant Neidorff admitted the policies had "some design flaws that were just so obvious to those of us who have been doing it for a long time" and that they "knew that when we bought [Health Net]."

5.     On September 7, 2016, Centene gave a presentation at the Wells Fargo Securities Healthcare Conference in Boston, Massachusetts.  During the presentation, Ed Kroll ("Kroll"), Centene's Senior Vice President, Finance and Investor Relations, gave further details on the increased reserves.  Kroll explained that Health Net "denied a lot of claims that [Centene] ... determined should be on the books [because] ... they were owed."

6.     Even this knowledge that Centene owed the demanded money did not stop the wrongdoing.  Subsequent investigative reporting that Health Net, post-Acquisition, tried to get around payments by demanding extensive documentation of treatments, even though the treatments received prior authorization.  In June 23, 2017, the California Department of Insurance ("CDI") issued an order to show cause stating that it received "hundreds of complaints" from treatment centers and laboratories over delayed, refused, or inadequate

payments from Health Net.  The CDI stated that Health Net had engaged in "unfair or deceptive" business practices by failing to settle provider claims fairly in which its liability "had become reasonably clear" and that the Company would be liable for penalties up to $10,000 for each violation.  It was only after the CDI's actions that Centene began truly making the effort to pay the money it owed, which could be tens or even hundreds of millions of dollars.

7.      Even now, the wrongdoing occurring at Health Net is still leaking out.   In December 2016, the U.S. Department of Justice ("DOJ") issued a civil investigative demand to Centene regarding Health Net's submission of risk adjustment claims to the Centers for Medicaid and Medicare Service ("CMS") under Parts C and D of Medicare.  The Company waited until February 2017 to disclose the civil investigative demand.  Centene explained that it is likely related to a previously undisclosed whistleblower lawsuit that claims Health Net and other companies engaged in an illegal scheme to submit false "risk adjustment" information to CMS in order to inflate reimbursement rates.  The whistleblower lawsuit has been on file since 2011.

8.      While the Individual Defendants (as defined herein) were aware of the wrongdoing described above, including the disastrous California insurance policies causing massive losses, the Board sent Centene's stockholders a Proxy Statement/Prospectus containing their recommendation that these stockholders vote in favor of the Acquisition.  Defendants at a minimum negligently prepared and filed the Proxy Statement/Prospectus on Registration Statement Form 424B3 with the SEC on September 21, 2015 (the "Proxy") which misleadingly stated Health Net's reserves and liabilities and that Health Net was complying with various laws, while also claiming to have done thorough due diligence into that company.  The Proxy was the essential link to the Company's purchase of Health Net and the significant harm that caused.

9.      In addition, after the Acquisition, certain of the Individual Defendants made improper statements concerning Health Net's business, including its liabilities.  As the truth came out, Centene's stock price dropped considerably, erasing $1.3 billion in market capitalization.  As a result, the Company and certain Individual Defendants are now subject to a securities fraud class action brought by purported investors in the Company.

10.     In addition, while the Company's stock price was inflated due to the improper statements, Centene repurchased tens of millions of dollars' worth of its stock from its own employees.  At the same time, the Insider Selling Defendants (as defined herein) were disposing tens of millions of dollars' worth of their personally held Centene stock, many times directly to the Company.

11.     Due to their direct involvement in the wrongdoing and substantial likelihood of liability its members face, any demand upon the Board to rectify the wrongdoing described herein would be a wasteful and useless act.  Accordingly, plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the

exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Centene maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Centene, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **THE PARTIES**

**Plaintiff**

15.     Plaintiff Harkishan Parekh was a stockholder of Centene at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Centene stockholder.

**Nominal Defendant**

16.     Nominal defendant Centene is a Delaware corporation with principal executive offices located at 7700 Forsyth Boulevard, St. Louis, Missouri.   Centene is a multinational healthcare corporation that provides services to government sponsored healthcare programs, focusing on underinsured and uninsured individuals.  The Company provides healthcare services to groups and individuals through health plans and offers a range of health insurance solutions. Centene also contracts with other healthcare and commercial organizations to provide specialty services including behavioral health management, care management software, correctional

healthcare services, dental benefits management, in-home health services, life and health management, managed vision, pharmacy benefits management, specialty pharmacy and telehealth services.   As of December 31, 2016, the Company had approximately 30,500 employees.

**Defendants**

17.     Defendant Neidorff is Centene's Chairman of the Board and has been since May 2004 and CEO, President, and a director and has been since May 1996. Defendant Neidorff was also Centene's Treasurer from May 1996 to November 2001. Defendant Neidorff was Chairman of Centene's Compliance Committee and a member of that committee from at least March 2015 to at least March 2017. Defendant Neidorff is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Neidorff knowingly, recklessly, or with gross negligence made improper statements in Centene's press releases and public filings concerning Health Net's business practices and results. Further, defendant Neidorff made materially misleading statements in the Proxy. While in possession of material, nonpublic information concerning Centene's true business health, defendant Neidorff disposed of 367,427 shares of his stock for $19,950,436.04 in proceeds. Centene paid defendant Neidorff the following compensation as an executive:

| Year | Salary | Performance Based Stock Awards | Service Based Stock Awards | Option Awards | Nonequity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------------------------|----------------------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $1,500,000 | $7,697,700 | $5,131,800 | $411,800 | $6,602,400 | $625,283 | $21,968,983 |
| 2015 | $1,200,000 | $6,165,600 | $6,165,600 | - | $6,585,750 | $638,153 | $20,755,103 |

18.     Defendant Jeffrey A. Schwaneke ("Schwaneke") is Centene's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer and has been since March 2016. Defendant Schwaneke was also Centene's Chief Accounting Officer from September 2008 to

March 2016; Corporate Controller from July 2008 to March 2016, Senior Vice President from December 2011 to March 2016; and Vice President from July 2008 to December 2011. Defendant Schwaneke is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Schwaneke knowingly, recklessly, or with gross negligence made improper statements in Centene's press releases and public filings concerning Health Net's business practices and results.  While in possession of material, nonpublic information concerning Centene's true business health, defendant Schwaneke disposed of 7,450 shares of his stock for $422,815.52 in proceeds. Centene paid defendant Schwaneke the following compensation as an executive:

| Year | Salary | Performance Based Stock Awards | Service Based Stock Awards | Nonequity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------------------------|---------------------------|---------------------------------------|------------------------|-------|
| 2016 | $632,671 | $1,350,240 | $900,160 | $1,404,572 | $37,386 | $4,325,029 |

19.    Defendant Robert K. Ditmore ("Ditmore") is a Centene director and has been since April 1996.  Defendant Ditmore was also Centene's Presiding Director from at least March 2004 to at least March 2017.  Defendant Ditmore knowingly or recklessly allowed the improper statements in Centene's press releases and public filings concerning Health Net's business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed.  Further, defendant Ditmore made materially misleading statements in the Proxy.  Centene paid defendant Ditmore the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|-------------|--------------|------------------------|-------|
| 2016 | $380,581 | $4,714 | $385,295 |
| 2015 | $375,999 | $4,290 | $380,289 |

20.    Defendant David L. Steward ("Steward") is a Centene director and has been since May 2003.  Defendant Steward knowingly or recklessly allowed the improper statements in

Centene's press releases and public filings concerning Health Net's business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed. Further, defendant Steward made materially misleading statements in the Proxy. Centene paid defendant Steward the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2016 | $350,581 | $4,714 | $355,295 |
| 2015 | $345,999 | $29,290 | $375,289 |

21.     Defendant John R. Roberts ("Roberts") is a Centene director and has been since March 2004. Defendant Roberts was also Chairman of Centene's Audit Committee and a member of that committee from at least March 2015 to at least March 2017. Defendant Roberts knowingly or recklessly allowed the improper statements in Centene's press releases and public filings concerning Health Net's business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed. Further, defendant Roberts made materially misleading statements in the Proxy. Centene paid defendant Roberts the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $30,000 | $335,581 | $29,714 | $395,295 |
| 2015 | $30,000 | $330,999 | $29,290 | $390,289 |

22.     Defendant Tommy G. Thompson ("Thompson") is a Centene director and has been since April 2005. Defendant Thompson was also Co-Chair of Centene's Government and Regulatory Affairs Committee and a member of that committee from at least March 2015 to at least March 2017. Defendant Thompson knowingly or recklessly allowed the improper statements in Centene's press releases and public filings concerning Health Net's business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed. Further, defendant Thompson made materially misleading

- 9 -

statements in the Proxy. Centene paid defendant Thompson the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2016 | $350,581 | $29,714 | $380,295 |
| 2015 | $345,999 | $14,290 | $360,289 |

23. Defendant Frederick H. Eppinger ("Eppinger") is a Centene director and has been since April 2006. Defendant Eppinger was also a member of Centene's Audit Committee from at least March 2015 to at least March 2017. Defendant Eppinger knowingly or recklessly made improper statements in Centene's press releases and public filings concerning the Company's liabilities and reserves and Health Net's business practices. Further, defendant Eppinger negligently made materially misleading statements in the Proxy. Centene paid defendant Eppinger the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2016 | $335,581 | $29,714 | $365,295 |
| 2015 | $330,999 | $29,290 | $360,289 |

24. Defendant Richard A. Gephardt ("Gephardt") is a Centene director and has been since December 2006. Defendant Gephardt was also Co-Chair of Centene's Government and Regulatory Affairs Committee and a member of that committee from at least March 2015 to at least March 2017. Defendant Gephardt knowingly or recklessly allowed the improper statements in Centene's press releases and public filings concerning Health Net's business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed. Further, defendant Gephardt made materially misleading statements in the Proxy. While in possession of material, nonpublic information concerning Centene's true business health, defendant Gephardt disposed of 15,910 shares of his stock for $1,096,058.20 in proceeds. Centene paid defendant Gephardt the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2016 | $350,581 | $29,714 | $380,295 |
| 2015 | $345,999 | $19,566 | $365,565 |

25.     Defendant Orlando Ayala ("Ayala") is a Centene director and has been since September 2011.  Defendant Ayala knowingly or recklessly allowed the improper statements in Centene's press releases and public filings concerning Health Net's business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed.  Further, defendant Ayala made materially misleading statements in the Proxy.  Centene paid defendant Ayala the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $115,000 | $210,581 | $4,714 | $330,295 |
| 2015 | $115,000 | $205,999 | $4,290 | $325,289 |

26.     Defendant Vicki B. Escarra ("Escarra") was a Centene director from March 2016 to April 2017.  Defendant Escarra was also member of Centene's Audit Committee from March 2016 to April 2017.  Defendant Escarra was also a Health Net director from July 2006 to March 2016.  Defendant Escarra knowingly or recklessly allowed the improper statements in Centene's press releases and public filings concerning Health Net's business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed.  Centene paid defendant Escarra the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $77,198 | $210,581 | $440,779 | $4,714 | $733,272 |

27.     Defendant Pamela A. Joseph ("Joseph") was a Centene director from September 2007 to April 2016.  Defendant Joseph was a member of Centene's Audit Committee from at least March 2015 to April 2016.  Defendant Joseph knowingly or recklessly allowed the improper statements in Centene's press releases and public filings concerning Health Net's

business practices and results, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed.  Further, defendant Joseph made materially misleading statements in the Proxy.  Centene paid defendant Joseph the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2016 | $40,179 | - | $40,179 |
| 2015 | $330,999 | $4,290 | $335,289 |

28.    Defendant K. Rone Baldwin ("Baldwin") was Centene's Executive Vice President, Markets from January 2016 to December 2016 and Executive Vice President, Insurance Group Business Unit from December 2012 to January 2016.  While in possession of material, nonpublic information concerning Centene's true business health, defendant Baldwin disposed of 37,858 shares of his stock for $2,318,253.72 in proceeds.  Centene paid defendant Baldwin the following compensation as an executive:

| Year | Salary | Performance Based Stock Awards | Service Based Stock Awards | Nonequity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2015 | $625,000 | $994,000 | $994,000 | $1,504,969 | $40,290 | $4,158,259 |

29.    Defendant Carol E. Goldman ("Goldman") was Centene's Executive Vice President and Chief Administrative Officer from June 2007 to at least April 2017.  While in possession of material, nonpublic information concerning Centene's true business health, defendant Goldman disposed of 69,807 shares of her stock for $4,272,759.98 in proceeds.  Centene paid defendant Goldman the following compensation as an executive:

| Year | Salary | Performance Based Stock Awards | Service Based Stock Awards | Nonequity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2015 | $600,000 | $923,000 | $923,000 | $1,696,200 | $76,576 | $4,218,776 |

30.    The defendants identified in ¶¶17-18, 28-29 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶17, 19-27 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶21, 23, 26-27 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶17-18, 24, 28-29 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶17-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.    By reason of their positions as officers and directors of Centene, each of the Individual Defendants owed and owe Centene and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Centene in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Centene and not in furtherance of their personal interest or benefit.

32.    To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Centene were required to, among other things:

(a)    accurately guide the Company's stockholders and the public when speaking about Centene's business practices and prospects, including those business practices at Health Net;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide

the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     refrain from using nonpublic information about the Company for their personal benefit; and

(d)     remain informed as to how Centene conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

33.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Centene, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

34.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in the improper practices described herein that wasted the Company's assets, and caused Centene to incur substantial damage.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Centene, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Centene has expended, and will continue to

expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

36.    In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Eppinger, Roberts, Joseph, and Escarra, owed specific duties to Centene to assist the Board in overseeing the Company's financial reporting and business practices.    The Audit Committee's Charter provides:

> The purpose of the Audit Committee is to assist the Board of Directors' oversight of:
>
> • the integrity of the Company's financial statements;
>
> • the Company's compliance with legal and regulatory requirements;
>
>          \*   \*   \*
>
> **Audited Financial Statements**
>
> 7. Review and Discussion. The Audit Committee shall meet to review and discuss with the Company's management and independent registered public accountant the Company's audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.
>
> 8. Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.
>
> 9. Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.
>
>          \*   \*   \*
>
> 11. Earnings Release and Other Financial Information. The Audit Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others.

- 15 -

12. Quarterly Financial Statements. The Audit Committee shall meet to review and discuss with the Company's management and independent registered public accountant the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Controls and Procedures**

13. Oversight. The Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.

\* \* \*

15. Risk Management. The Audit Committee shall discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Centene, regarding the Individual Defendants' management of Centene's and Health Net's operations; (ii) facilitate the Insider Selling Defendants' illicit disposition of approximately $28 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Centene and the profits, power, and prestige that the Individual

Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

39. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused Centene to issue improper financial statements.

40. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning Centene's operations, financial condition, and future business prospects.

41. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Centene to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

**GAAP and SEC Requirements**

43.     Generally Accepted Accounting Principles ("GAAP") are a common set of accounting principles, standards, and procedures that companies must follow when they compile their financial statements.   GAAP is a combination of authoritative standards (set by policy boards) and the commonly accepted ways of recording and reporting accounting information. The purpose of GAAP is to improve the clarity of communication of financial information.

44.     Centene (and Health Net) are subject to SEC Regulation S-X.   Regulation S-X states that annual and interim financial statements filed with the SEC must be prepared in accordance with GAAP or they will presumed to be misleading and inaccurate, even a company provides accompanying disclosures with the non-GAAP financial statements.   In addition, SEC Rule 12b-20 requires that periodic reports contain such information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

45.     The Financial Accounting Standards Board's Accounting Standards Codification ("ASC") 805 details the accounting for "Business Combinations" under GAAP.   ASC 805 requires that an acquirer value acquired assets and liabilities at "fair value as of the acquisition date."

46.     In turn, ASC 820 explains "Fair Value Measurements."   Fair value is defined in ASC 820 as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."   Fair value measurements for an asset assume the highest and best use by these market participants.

47.     While ASC 805 does allow companies to publish preliminary estimates of certain assets and liabilities of an acquired company, then later revise those estimates, such steps are only proper when the information is not known by the acquirer as of the acquisition date.

48.     Concerning medical liabilities, ASC 954-450-30-4, "Health Care Entities, Contingencies, Initial Measurement," states that "[l]osses under prepaid health care services contracts shall be recognized when it is probable that expected future health care costs and maintenance costs under a group of existing contracts will exceed anticipated future premiums and stop-loss insurance recoveries on those contracts." ASC 954-450-35-1, "Health Care Entities, Contingencies, Subsequent Measurement," states that "[e]stimated losses are reviewed and changed, if necessary, at each reporting date. The amounts of the changes are recognized currently as additional expense or as a reduction of expense."

49.     Centene, and Health Net, must also comply with SEC regulations regarding financial statements, even if they are not specified under GAAP. Of particular relevance in this matter, SEC Regulation S-K, Item 303(b), 17 C.F.R. §229.303, "Interim Periods," requires registrants to include a management's discussion and analysis in all interim period financial statements, "so as to enable the reader to assess material changes in financial condition and results of operations" for the most recent quarter and year-to-date periods for both the current and prior year. SEC Regulation S-K, Item 303(a), required that Centene:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

50.     The Instructions to SEC Regulation S-K, Item 303, state that company financial statements "shall focus specifically on material events and uncertainties known to management

- 19 -

that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." SEC Guidance FR-36, Management's Discussion and Analysis of Financial Condition and Results of Operations, states that disclosure is required for "known uncertaint[ies] reasonably likely to have material future effects on [the company's] financial condition."

51.    SEC Release No. 33-8040, "Cautionary Advice Regarding Disclosure about Critical Accounting Policies," instructs registrants to comply with Regulation S-K, Item 303(a), "Management's Discussion and Analysis of Financial Condition and Results of Operations." When estimates are susceptible to material change, the company must discuss not just the possibility that its estimates may turn out differently, but also: (i) the factors that may cause different outcomes; and (ii) the potential amount of variability in its significant estimates: "Companies should provide quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors." SEC Release No. 33-8350, "Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations."

## Health Net Begins Losing Money on Substance Abuse Treatment Polices that Resulted from Changes in Healthcare Insurance Laws

52.    Prior to the Acquisition, Health Net was a publicly traded managed care organization that delivered health care services through health plans and government-sponsored managed care plans. Health Net provided for and administered health benefits to approximately 6.1 million individuals across the U.S.; however, a large portion of these individuals were located in California and other western states.

53.    One of the changes implemented by the Patient Protection and Affordable Care Act ("ACA") is the requirement that certain individual health insurance policies include coverage

for substance abuse related conditions. In particular, since 2014, the ACA demanded that newly eligible Medicaid enrollees and most individual and small group health plans provide ten mandatory "essential health benefits." Though states have considerable flexibility in determining the details of these essential health benefits, substance abuse treatment is among the required benefit categories. These changes allowed tens of millions of people to receive covered substance abuse treatment. As the opioid crisis continued unabated, many people in California and Arizona took advantage of this healthcare option.

54.     Health Net offered favorable (to providers and customers, but not Health Net) exclusive provider organization ("EPO") and preferred provider organization ("PPO") individual health insurance policies that covered substance abuse related services, as mandated by the ACA.

55.     People took advantage of these favorable policies on substance abuse, which caused substantial losses for Health Net. In 2014, the first full year of the ACA's market reform implementation, Health Net lost $120 million on its California substance abuse policies, consisting of collection of $232 million in premiums, but incurring $352 million in claims. The next year, Health Net's loss on California substance abuse policies more than doubled to $286 million, consisting of $189 million in premiums and $475 million in claims.

56.     Health Net was seeing similar massive increases in claims concerning its substance abuse policies in Arizona.

57.     However, the increasing losses failed to reflect just how bad the situation in California and Arizona was for Health Net. That is because since at least 2015, Health Net was taking drastic steps to reduce claims. In particular, Health Net was refusing to reimburse substance abuse treatment centers and laboratories at agreed upon rates for preapproved agreed upon services. By doing so, Health Net appeared stronger than it was financially.

**Health Net Secretly Violates Federal Law Concerning Submitting False Claims to the Government**

58.     Medicare Advantage is a type of health insurance program within Part C of Medicare.  Medicare Advantage provides a managed health care plan that is paid based on a monthly capitated fee[1] as an alternative to traditional fee-for-service option.  Specifically, the Centers for Medicare and Medicaid Services ("CMS") pays Medicare Advantage Organizations ("MA Organizations"), such as Health Net, to offer beneficiaries a private plan alternative to the original Medicare program.  CMS pays MA Organizations a predetermined monthly amount for each enrolled beneficiary.  The monthly payments are "risk adjusted" using a complex formula called a "risk score," which is supposed to pay higher rates for sicker patients than for people in good health.  For example, a depression diagnosis that is reclassified as a "major" depression would receive a higher risk score.  Higher risk scores, in turn, generate increased risk adjustment monthly payments by the federal government.

59.     This payment model provides a powerful incentive for MA Organizations such as Health Net to boost their profits by over-reporting diagnosis codes and exaggerating the expected healthcare costs for their enrollees.  Thus, in attempt to combat exaggerated reporting and the commensurate over-payments by Medicare, the government requires that submitted diagnoses must be unambiguously supported and validated by the beneficiaries' medical records.[2]  Further, each MA Organization must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS's program

---

[1] "Capitation" is a payment arrangement for health care services that pays a physician or group of physicians a set amount for each enrolled person assigned to them, per period of time, whether or not that person seeks care.

[2] *See* 65 FR 40170-01 at 40264 (June 29, 2000)

requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."[3] The compliance program "must, at a minimum, include [certain] core requirements," including effective monitoring and audits, effective establishment and implementation of procedures for responding to compliance issues, and timely inquiry and self-reporting of potential misconduct. Specifically, among other things, MA Organizations are responsible for the following core compliance requirements:

> (F) *Establishment and implementation of an effective system for routine monitoring and identification of compliance risks*. The system should include *internal monitoring and audits* and, as appropriate, external audits, to evaluate the MA organization['s], including first tier entities', *compliance with CMS requirements and the overall effectiveness of the compliance program*.

> (G) *Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised*, investigating potential compliance problems as identified in the course of self-evaluations and audits, *correcting such problems promptly and thoroughly to reduce the potential for recurrence*, and *ensure ongoing compliance with CMS requirements*.

>> (1) If the MA organization discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct.

>> (2) *The MA organization must conduct appropriate corrective actions (for example, repayment of overpayments*, disciplinary actions against responsible employees) in response to the potential violation referenced in paragraph (b)(4)(G)(1) of this section.

>> (3) *The MA organization should have procedures to voluntarily self-report potential fraud or misconduct* related to the MA program to CMS or its designee.

60.     In addition, MA Organizations must submit all risk adjustment data, including diagnoses, to CMS using CMS's Risk Adjustment Processing System ("RAPS").   Federal

---

[3] 42 C.F.R. §422.503(b)(4)(vi) (Part C); 42 C.F.R. §423.504(b)(4)(vi) (Part D).

regulations require MA Organizations (through their CEO or CFO)[4] to expressly certify that the diagnosis codes and risk adjustment data provided to Medicare are accurate, complete, and truthful.[5] Further, as explained by the DOJ, "MA Organizations are responsible for deleting RAPS data submissions if the diagnoses that they submitted are [later discovered to be] invalid." This "allows CMS to recalculate the beneficiaries' risk scores and ensure that the Medicare Program does not make improper risk adjustment payments to MA Organizations or that the Program recovers improper payments that were already made."

61.      The federal False Claims Act ("FCA") prohibits: (i) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (ii) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (iii) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government; and (iv) conspiring to violate any of these three sections of the FCA. 31 U.S.C. §§3729(a)(1)(A)-(C) and (G). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1). For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in

---

[4] Or an individual delegated with the authority to sign on behalf of the CEO and/or CFO, and who reports directly to such officer.

[5] Relevant federal regulations include 42 C.F.R. §422.503(b)(4)(vi) and 42 C.F.R. §423.505(k).

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1).

62.      Each claim for a risk adjustment payment that is submitted to CMS where the patient was not treated by a qualified provider for that year in question, or the treatment and condition are not properly documented in the medical record, is false and violates the FCA if the submitter knew the claim was false *or* later discovers its falsity and refused to correct the claim.

63.      The FCA permits whistleblowers to bring claims against entities that overcharged the government.

64.      Unbeknownst to the general public, in 2011, a whistleblower sued Health Net and a number of other health insurers for violating the FCA concerning its submission of risk adjustment claims to the CMS.   In particular, the whistleblower revealed that Health Net "upcoded" risk adjustment claims by claiming that a patient had been treated for a diagnosis that the person did not have, a more severe diagnosis than the one the patient had, or a diagnosis that the patient previously had been treated for, but which was not treated in the relevant year.

65.      The whistleblower revealed that Health Net contracted with a subsidiary of UnitedHealth Group, Inc. ("UnitedHealth"), Ingenix, Inc. ("Ingenix"), to process and submit risk adjustment claims to CMS using a flawed system that resulted in upcoding.   The whistleblower explained that Health Net specifically agreed to Ingenix reviewing its charts for incremental and incorrect codes.   According to the whistleblower, Health Net was the only outside commercial client of Ingenix to agree to these chart reviews.

66.      On February 15, 2017, the DOJ partially intervened in the whistleblower's lawsuit in order to pursue claims against UnitedHealth.   It was only then that Health Net's wrongdoing concerning its FCA violations became public.

67.    Further, on February 21, 2017, Centene revealed for the first time that it received a Civil Investigative Demand from the DOJ concerning Health Net's submission to risk adjustment claims to CMS under Parts C and D of Medicare.

## THE ACQUISITION

68.    The Individual Defendants began their pursuit of Health Net in 2014.   In November 2014, defendant Neidorff contacted Health Net to discuss a potential acquisition by Centene of that company.   On November 23, 2014, defendant Neidorff met with Health Net's CEO to discuss market conditions and each companies' respective businesses, as well as how they could potentially complement each other.

69.    On March 2, 2015, defendant Neidorff met again with representatives of Health Net.   During this meeting, they discussed the impact of the ACA on their businesses.   By this point, Health Net was experiencing substantial increases in claims due to the requirements that it cover substance abuse treatment, especially in western states.   Defendant Neidorff reported the content of this meeting to the Board.

70.    Defendant Neidorff continued discussions with Health Net throughout March, April, and May of 2015.   On June 8, 2015, defendant Neidorff finally told Health Net's CEO that Centene would like to pursue an acquisition of Health Net.   During that meeting, they discussed not just that interest, but also how a potential business combination would look.   Defendant Neidorff stated that Centene would like to begin due diligence the following week.

71.    After negotiating a confidentiality agreement, on June 16, 2015, Centene began its due diligence of Health Net.   By this point in time, Health Net was fully experiencing rising claims due to the ACA and its substance abuse coverage.

72.     That same day, the Board met to discuss the potential purchase of Health Net. During that meeting, defendant Neidorff explained his rationale for pursuing a purchase of Health Net and that in-person due diligence had begun.

73.     On June 23, 2015, the Board met again to discuss the potential acquisition of Health Net.  During that meeting, the Board discussed the on-going due diligence into Health Net and the Company's findings thus far.  That day, Centene offered to acquire Health Net for a mix of stock and cash with an implied value of $73 per share, a 13% premium.

74.     After Health Net's financial advisor expressed skepticism that the board of Health Net would be interested in a transaction at that price, Centene conducted further due diligence. On June 25, 2015, Centene increased its offer to $75.50 per share.  The parties continued to negotiate on a price to acquire Health Net over the following week.

75.     On June 30, 2015, the Board met again.  During that meeting, the Board discussed the potential purchase of Health Net, including the strategic rationale for the transaction and the Company's due diligence review.  The Board held a similar meeting and conducted a similar review of the due diligence on July 1, 2015.

76.     Also on July 1, 2015, Centene offered a cash and stock mix for Health Net with an implied value of $78.57 per share.  Health Net agreed to this price that same day.  On July 2, 2015, the companies executed the Agreement and Plan of Merger (the "Merger Agreement"). That morning they issued a joint press release announcing the deal.

77.     On August 19, 2015, Centene filed with the SEC a Preliminary Proxy Statement/Prospectus on Registration Statement Form S-4 in support of the Acquisition.  A month later, on September 21, 2015, Centene filed the misleading Proxy.  The Proxy sought approval to issue enough stock to consummate the Acquisition, among other matters.

- 27 -

78.     On October 23, 2015, Centene held a meeting of stockholders to effectively vote on the Acquisition.  Based on the information contained in the misleading Proxy, stockholders voted in favor of the share issuance.  Health Net's stockholders also voted in favor of the Acquisition.

79.     The Acquisition, however, did not immediately close.  The Company first needed clearance from different regulators.  While that approval was pending, Centene was working on how to integrate Health Net into its business.  The Board of Centene was intimately aware of this process and the business and regulatory issues in place.  For instance, on an October 27, 2015 earnings and conference call with analysts and investors, defendants Neidorff stated, "speaking on behalf of the whole management team, the Board, we are very pleased with the [integration] progress at how it's going."

80.     During a December 9, 2015 presentation at the Oppenheimer Healthcare Conference in New York, defendant Neidorff underscored the importance of the Acquisition to the Company, stating "[t]here's probably no time in [Centene's] history or its future that will be more transitional than what we've just done with Health Net.  It has taken us from an also-ran to one of the big four."  Defendant Neidorff further stated that "[w]e have good growth and have good visibility into 2016, 2017, and little bit of 2018."

81.     On March 22, 2016, California's regulators finally approved the Acquisition.  Centene closed the Acquisition on March 24, 2016.

## IMPROPER STATEMENTS

**The Misleading Proxy**

82.     In the Acquisition, each stockholder of Health Net would receive $28.25 in cash and 0.622 shares of Centene stock for each share of Health Net stock.  As a result, Health Net's

former stockholders would own approximately 29% of Centene's outstanding stock after the close of the Acquisition.  Due to the large transfer of ownership, Centene's stockholders were required to vote on the Health Net transaction.  Accordingly on August 18, 2015, defendants Neidorff, Ditmore, Eppinger, Gephardt, Ayala, Roberts, Steward, Thompson, and Joseph, defendants (the "Proxy Defendants"), which comprised the entire Board of Centene at that time, issued the Preliminary Proxy Statement/Prospectus seeking stockholder approval for the issuance of the common stock necessary to complete the Acquisition.  Approximately a month later, on September 21, 2015, the Proxy Defendants issued the Proxy.  Both the preliminary and definitive proxies contain the same material misstatements detailed below.[6]  The Proxy explicitly states that "[a]pproval of the Share Issuance proposal is required to complete the [Acquisition]."  The Proxy Defendants unanimously recommended that stockholders vote in favor of the share issuance necessary to consummate the Acquisition.

83.    This Proxy, which by its own admission, was necessary to complete the Acquisition, was materially misleading.  The Proxy Defendants, in turn, were negligently responsible for the misleading Proxy.  By the time the Proxy Defendants issued the misleading Proxy, Health Net was experiencing significant increases in claims related to its substance abuse policies, which would cause it to significantly increase reserves.  The Proxy Defendants claimed in the materially misleading Proxy that Centene's representatives conducted substantial due diligence into Health Net and that they reviewed this due diligence.  Further, as the truth slowly came out, Centene admitted that the flaws in the plans leading to these increased liabilities were both obvious and known.

---

[6] For ease of reference, plaintiff's page citations are to the Proxy.

84.     On page 33 of Proxy, the Proxy Defendants explicitly incorporated by reference Health Net's Annual Reports for each year of the five-year period ended December 31, 2014, and the Quarterly Report for the period ending June 30, 2015, all of which were filed with the SEC. These SEC filings failed to include qualitative and quantitative disclosures about Health Net's increasing liabilities from its poorly written EPO and PPO plans, as they apply to substance abuse treatments, in violation of SEC Regulation S-K, Item 303(a).

85.     In discussing the changes made by the ACA and its effect on Health Net's business, Health Net's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 filed with the SEC on February 27, 2015 (the "2014 Form 10-K") stated:

> The Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010 (collectively, the "ACA") has altered and continues to alter the dynamics of the health care insurance industry. The breadth and scope of these changes have presented us with a number of new and substantial business opportunities as well as a number of strategic and operational challenges. Among other things, the ACA required the modification of existing commercial products and the development of new products beginning with the 2014 benefit year. In response, we developed new health plans both for the ACA's individual health insurance exchanges and for off-exchange use that met the ACA's essential health benefits standard and other requirements.

> \*   \*   \*

> In connection with the ACA, the federal government extended funds to those states that opted to expand Medicaid eligibility from a pool that included residents with incomes up to 100% of the federal poverty level ("FPL") to an expanded pool of residents with incomes up to 133% of the FPL. Both Arizona and California are amongst the states that have opted into this "Medicaid expansion," which has increased and is expected to continue to increase our Medicaid membership.

> California also recently enacted a bill under which DHCS expanded the list of benefits that we are required to provide to our Medi-Cal population. Under this legislation, which became effective as of January 1, 2014, we began administering certain mental health outpatient benefits to all our Medi-Cal members, including those newly eligible as a result of Medicaid expansion, and closely coordinating mental health and substance abuse services activities with county mental health departments.

* * *

The ACA transformed the U.S. health care system through a series of complex initiatives. Due in part to the magnitude, scope and complexity of these initiatives, as well as their ongoing implementation, the ultimate impact of the ACA on us remains difficult to predict. The ACA has provided growth opportunities for health insurers, including us, but also introduces new risks and uncertainties, and required changes in the way products are designed, underwritten, priced, distributed and administered. While we have experienced significant growth in our revenues and membership in certain products as a result of the ACA, the measures initiated by the ACA and the associated preparation for and implementation of these measures have had, and will continue to have, an adverse impact on, among other things, the costs of operating our business, and could materially adversely affect our business, cash flows, financial condition and results of operations.

86.     While Health Net's 2014 Form 10-K did warn that the ACA was complex and would affect its business, it did not disclose the negative impact it had already caused for the previous year.  Health Net's plans, as written, concerning substance abuse treatment, were causing a significant increase in liabilities.

87.     The 2014 Form 10-K also discussed Health Net's liabilities and reserves for those liabilities.  However, Health Net's liabilities were drastically understated.  The 2014 Form 10-K stated:

### Reserves For Contingent Liabilities

In the course of our operations, we are involved on a routine basis in various disputes with members, health care providers, and other entities or individuals, as well as audits or investigations by government agencies and elected officials that relate to our services and/or business practices that expose us to potential losses.

We recognize an estimated loss, which may represent damages, assessment of regulatory fines or penalties, settlement costs, future legal expenses or a combination of the foregoing, as appropriate, from such loss contingencies when it is both probable that a loss will be incurred and the amount of the loss can be reasonably estimated. Our loss estimates are based in part on an analysis of potential results, the stage of the proceedings, consultation with outside counsel and any other relevant information available.

* * *

Reserves for claims and other settlements include reserves for claims (IBNR [incurred but not reported] claims and received but unprocessed claims), and other liabilities including capitation payable, shared risk settlements, provider disputes, provider incentives and other reserves for our health plan services. The table below provides a reconciliation of changes in reserve for claims for the years ended December 31, 2014, 2013 and 2012.

| | Health Plan Services Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | 2012 |
| | (Dollars in millions) | | |
| Reserve for claims (a), beginning of period | $ 807.4 | $ 808.7 | $ 720.8 |
| Incurred claims related to: | | | |
| Current year (f) | 5,613.0 | 4,666.0 | 4,950.9 |
| Prior years (c) | (14.6) | (56.2) | 34.5 |
| Total incurred (b) | 5,598.4 | 4,609.8 | 4,985.4 |
| Paid claims related to: | | | |
| Current year | 4,443.2 | 3,872.5 | 4,156.6 |
| Prior years | 776.3 | 738.6 | 740.9 |
| Total paid (b) | 5,219.5 | 4,611.1 | 4,897.5 |
| Reserve for claims (a), end of period | 1,186.3 | 807.4 | 808.7 |
| Add: | | | |
| Claims and claims-related payable (d) | 175.4 | 67.0 | 91.6 |
| Other (e) | 534.3 | 109.7 | 137.7 |
| Reserves for claims and other settlements, end of period | $ 1,896.0 | $ 984.1 | $ 1,038.0 |

(a)    Consists of IBNR claims and received but unprocessed claims and reserves for loss adjustment expenses.

(b)    Includes medical claims only. Capitation, pharmacy and other payments (including, for example, provider settlements) are not included.

(c)    This line represents the change in reserves attributable to the difference between the original estimate of incurred claims for prior years and the revised estimate. Negative amounts in this line represent favorable development in estimated prior years' health care costs. Positive amounts in this line represent unfavorable development in estimated prior years' health care costs. The net favorable development related to prior years that was recorded in the year ended December 31, 2014 consisted of $36.6 million in unfavorable prior year development primarily due to unanticipated benefit utilization in our commercial business arising from dates of service in the fourth quarter of 2013 as a result of an uncertain environment related to the ACA and a release of $51.2 million of the provision for adverse deviation held at December 31, 2013. The favorable development related to prior years that was recorded in the year ended December 31, 2013 resulted from claims being settled for amounts less than originally

estimated. In 2013, this was primarily due to the absence of moderately adverse conditions. The favorable developments related to prior years that were recorded in 2014 and 2013 do not directly correspond to an increase in our operating results for those periods because any favorable prior period reserve development increases current period net income only to the extent that the current period provision for adverse deviation (see footnote (f)) is less than the benefit recognized from the prior period favorable development. The unfavorable development in estimated prior years' health care costs for 2012 primarily resulted from significant delays in claims submissions for the fourth quarter of 2011 arising from issues related to a new billing format required by HIPAA combined with an unanticipated flattening of commercial trends. See Note 2 under the heading "Health Plan Services Health Care Cost" for more information.

(d)      Includes claims payable, provider dispute reserve, and other claims-related liabilities.

(e)      Includes accrued capitation, shared risk settlements, provider incentives and other reserve items.

(f)      Our IBNR estimate also includes a provision for adverse deviation, which is an estimate for known environmental factors that are reasonably likely to affect the required level of IBNR reserves. Such amounts were $77.7 million.

* * *

**LIABILITIES AND STOCKHOLDERS' EQUITY**

| Current Liabilities: | | | | |
|---|---|---|---|---|
| Due to subsidiaries | $ | 284,654 | $ | 237,555 |
| Deferred taxes | | 34,684 | | |
| Other liabilities | | 130,580 | | 100,755 |
| Total current liabilities | | 449,918 | | 338,310 |
| Intercompany notes payable—long term | | 1,047,947 | | 977,233 |
| Long term debt | | 499,504 | | 499,300 |
| Other liabilities | | 115,591 | | 161,442 |
| Total Liabilities | | 2,112,960 | | 1,976,285 |

88.     Health Net's Quarterly Report on Form 10-Q for the second quarter ended June 30, 2015 ("Q2 2015 Form 10-Q"), filed with the SEC on August 4, 2015, contained similar misleading statements about the effect of the ACA and understated Health Net's liabilities. The Q2 2015 Form 10-Q stated:

| LIABILITIES AND STOCKHOLDERS' EQUITY | | | |
|---|---|---|---|
| Current Liabilities: | | | |
| Reserves for claims and other settlements | $ | 1,757,939 | $ 1,896,035 |
| Health care and other costs payable under government contracts | | 75,092 | 71,988 |
| Unearned premiums | | 190,021 | 96,106 |
| Accounts payable and other liabilities | | 1,168,014 | 880,374 |
| Total current liabilities | | 3,191,066 | 2,944,503 |
| Senior notes payable | | 399,607 | 399,504 |
| Borrowings under revolving credit facility | | 210,000 | 100,000 |
| Other noncurrent liabilities | | 346,915 | 242,705 |
| Total Liabilities | | 4,147,588 | 3,686,712 |

89.     In addition, while the Q2 2015 Form 10-Q warned that the ACA could and was affecting Health Net's business, it failed to disclose the negative effects of Health Net's substance abuse policies and the drastically increasing liabilities it was causing.  The Q2 2015 Form 10-Q stated:

> The ACA transformed the U.S. health care system through a series of complex initiatives. Due in part to the magnitude, scope and complexity of these initiatives, as well as their ongoing implementation, the ultimate impact of the ACA on us remains difficult to predict. The ACA has provided growth opportunities for health insurers, including us, but also introduces new risks and uncertainties, and required changes in the way products are designed, underwritten, priced, distributed and administered. While we have experienced significant growth in our revenues and membership in certain products as a result of the ACA, the measures initiated by the ACA and the associated preparation for and implementation of these measures have had, and will continue to have, an adverse impact on, among other things, the costs of operating our business, and could materially adversely affect our business, cash flows, financial condition and results of operations.

90.     Further, Health Net's annual and quarterly filings during that period included inflated revenue and income amounts due to its receiving unwarranted amounts by violating the FCA.  While the 2014 Form 10-K stated that Health Net it "[is], and maybe in the future, subject to qui tam litigation brought by individuals who seek to sue on behalf of the government for

violations of, among other things, state and federal false claims laws," and thus put the Proxy Defendants on notice about the wrongdoing at Health Net, the Proxy still includes Health Net's reported financials with no description of, or warning about, their inflation.

91.     On page 37 of the Proxy, the Proxy Defendants explained that the Company will account for the Acquisition under the acquisition method of accounting, "which means the assets and liabilities of Health Net will be recorded, as of the completion of the transaction, at their respective fair values and added to those of Centene." This statement, however, was false, because Health Net's liabilities did not reflect their true fair value, as further explained herein.

92.     On page 50 of the Proxy, the Proxy Defendants claimed that there was a risk that "unanticipated changes in federal or state laws or regulations, including the ACA and the Health Care Education Affordability Reconciliation Act and any regulations enacted thereunder." However, this risk had already materialized and Health Net was facing increasing claims on its policies covering substance abuse.

93.     On page 66 of the Proxy, the Proxy Defendants claimed that Health Net was a "lead[] compan[y] in responding to the ACA and building low cost, high quality solutions for the future" and as such, Centene could use Health Net "to expand the reach of their low cost, high quality solutions by geography and product line." The truth was, however, that Health Net had poorly written its health care plans that allowed substance abuse claims mandated by the ACA to substantially increase.

94.     On page 67 of the Proxy, the Proxy Defendants stated that they considered the "general risks of market conductions ... as well as the other risks and uncertainties discussed in Health Net's public filings with the SEC." This statement is misleading because it implies that the Proxy Defendants conducted a thorough due diligence review and identified the issues facing

Health Net. However, this was not the case, as the Proxy contained understated liabilities and failed to disclose that Health Net was currently facing significantly increased claims on its substance abuse policies.

95.    On page 188 of the Proxy, the Proxy Defendants claimed that "[t]he assets and liabilities of Health Net have been measured based on various preliminary estimates using assumptions that Centene believes are reasonable based on information that is currently available." However, by the time the Proxy was issued, the currently available information already demonstrated the issues with Health Net's plans, especially as they concerned substance abuse treatment.

96.    On page 192 of the Proxy, the Proxy Defendants included Health Net's liabilities, including medical claims liabilities, which were materially understated. The Proxy stated:

**Unaudited Pro Forma Condensed Combined Balance Sheet**
**As of June 30, 2015**
**(In millions, except share data)**

| | Centene | Health Net | Pro Forma Adjustments (Note 7) | | Pro Forma Combined |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current assets:** | | | | | |
| Cash and cash equivalents | $1,967 | $ 757 | $ 117 | (d) | $ 2,841 |
| Premium and related receivables | 1,248 | 1,116 | — | | 2,364 |
| Short term investments | 140 | 2,372 | — | | 2,512 |
| Other current assets | 483 | 614 | — | | 1,097 |
| Total current assets | 3,838 | 4,859 | 117 | | 8,814 |
| Long term investments | 1,541 | 7 | — | | 1,548 |
| Restricted deposits | 101 | — | — | | 101 |
| Property, software and equipment, net | 462 | 81 | (43) | (c) | 500 |
| Goodwill | 811 | 559 | 2,671 | (a) | 4,041 |
| Intangible assets, net | 148 | 10 | 1,490 | (b) | 1,648 |
| Other long term assets | 121 | 344 | — | | 465 |
| Total assets | $7,022 | $ 5,860 | $ 4,235 | | $ 17,117 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| **Current liabilities:** | | | | | |
| Medical claims liability | $2,092 | $ 1,758 | $ — | | $ 3,850 |
| Accounts payable and accrued expenses | 1,004 | 1,243 | 151 | (e) | 2,398 |
| Return of premium payable | 289 | — | — | | 289 |
| Unearned revenue | 68 | 190 | — | | 258 |
| Current portion of long term debt | 5 | — | — | | 5 |
| Total current liabilities | 3,458 | 3,191 | 151 | | 6,800 |
| Long term debt | 1,139 | 610 | 2,382 | (d), (f) | 4,131 |
| Other long term liabilities | 330 | 347 | 484 | (g) | 1,161 |
| Total liabilities | 4,927 | 4,148 | 3,017 | | 12,092 |
| Commitments and contingencies | | | | | |
| Redeemable noncontrolling interests | 155 | — | — | | 155 |
| **Stockholders' equity:** | | | | | |
| Preferred stock | — | — | — | (h) | — |
| Common stock (1) | — | — | — | (h) | — |
| Additional paid-in capital | 891 | 1,482 | 1,575 | (h) | 3,948 |
| Accumulated other comprehensive loss | (4) | (14) | 14 | (i) | (4) |
| Retained earnings | 1,154 | 2,698 | (2,825) | (i) | 1,027 |
| Treasury stock, at cost | (101) | (2,454) | 2,454 | (h) | (101) |
| Total stockholders' equity attributable to common stockholders | 1,940 | 1,712 | 1,218 | | 4,870 |
| Noncontrolling interest | — | — | — | | — |
| Total stockholders' equity | 1,940 | 1,712 | 1,218 | | 4,870 |
| Total liabilities and stockholders' equity | $7,022 | $ 5,860 | $ 4,235 | | $ 17,117 |

(1)   On an historical basis, share information of Centene is as follows: 200,000,000 shares authorized; 119,087,944 shares issued and outstanding. On a pro forma combined basis, share information is as follows: 200,000,000 shares authorized 168,187,553 shares issued and outstanding.

See the accompanying notes to the unaudited pro forma condensed combined financial statements, which are an integral part of these statements. The pro forma adjustments are explained in Note 7. Balance Sheet Pro Forma Adjustments, beginning on page 200 of this proxy statement/prospectus.

192

97.     On page 194, the Proxy Defendants claimed that the presentation of the financial information complied with ASC 805 and uses the fair value concepts set forth in ASC 820.  ASC 805 requires, as the Proxy admits, "that most assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date."  On that same page, the Proxy

Defendants also stated that "[u]nder the acquisition method of accounting, the assets acquired and liabilities assumed will be recorded, as of completion of the merger, primarily at their respective fair values and added to those of Centene." However, as explained herein, Health Net's liabilities were understated and therefore were not recorded at fair value in accordance with ASC 805 and ASC 820.

98.    On page 196 of the Proxy, the Proxy Defendants disclosed a summary of Health Net's assets and liabilities that Centene would assume. As explained above, Health Net's liabilities were understated, which caused an overstatement in net assets. The Proxy stated:

| Assets Acquired and Liabilities Assumed: | At June 30, 2015 |
|---|---:|
| Net book value of net assets acquired | $ 1,712 |
| Less historical: | |
| Goodwill | (559) |
| Intangible assets | (10) |
| Capitalized internal-use software | (43) |
| Deferred tax assets on outstanding equity awards | (5) |
| Deferred tax liabilities on historical internal-use software | 38 |
| Deferred tax liabilities on historical intangible assets | 16 |
| **Adjusted book value of net assets acquired** | **1,149** |
| Goodwill (a) | 3,230 |
| Identified intangible assets (b) | 1,500 |
| Deferred tax liabilities (c) | (557) |
| Fair value adjustment to debt (d) | (35) |
| Property and equipment (e) | — |
| **Consideration transferred** | **$ 5,287** |

99.    The Proxy also attached the Merger Agreement dated July 2, 2015, between Centene, Health Net, and certain of Centene's subsidiaries. On pages A-24 through A-25 of the Proxy, the Merger Agreement stated that Health Net has been in compliance with all health care and insurance laws since January 2013, specifically including the federal Anti-Kickback Statute and the FCA, and all regulations promulgated thereunder. In reality, Health Net was and had been violating the FCA, at a minimum.

100.    Centene's stockholders would find Health Net's financial information material, including a true picture of its income, revenues, reserves, and liabilities. Due to the inflation in

these numbers, Centene's stockholders approved of the purchase of Health Net for a drastically inflated price. The proxy solicitation process in connection with the Proxy was an essential link in Centene stockholders' decision to approve the share issuance necessary to complete the Acquisition.

**Improper Post-Acquisition Statements**

101.    After the completion of the Acquisition, the Individual Defendants continued to make improper statements about Health Net's liabilities and reserves, even though they had complete control of it by this point. Further, the Individual Defendants failed to acknowledge that Health Net, both before and after the Acquisition, stopped reimbursing substance abuse treatment facilities the amounts that the company owed.

102.    On April 26, 2016, Centene filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016 with the SEC. The Form 10-Q addressed the recently completed Acquisition. The Form 10-Q discussed the assets and liabilities acquired from Health Net. As explained herein, the Form 10-Q understated Health Net's liabilities, in particular, its medical claims liability. In addition, the Form 10-Q failed to disclose the "known trends or uncertainties" and "known uncertaint[ies] reasonably likely to have material future effects on [the company's] financial condition," by failing to discuss the rising substance abuse claims and other issues with the Arizona and California insurance plans. The Form 10-Q stated:

**Assets acquired and liabilities assumed**

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 1,422 |
| Premium and related receivables [a] | | 1,076 |
| Short term investments | | 40 |
| Other current assets | | 670 |
| Long term investments | | 1,965 |
| Restricted deposits | | 36 |
| Property, software and equipment, net | | 43 |
| Intangible assets [b] | | 1,500 |
| Other long term assets | | 203 |
| Total assets acquired | | 6,955 |
| | | |
| Medical claims liability | | 1,370 |
| Borrowings under revolving credit facility | | 285 |
| Accounts payable and accrued expenses | | 1,928 |
| Return of premium payable | | 375 |
| Unearned revenue | | 117 |
| Long term deferred tax liabilities [c] | | 415 |
| Long term debt [d] | | 418 |
| Other long term liabilities | | 369 |
| Total liabilities assumed | | 5,277 |

103.    Also on April 26, 2016, Centene held an earnings conference call with analysts and investors to discuss its first quarter of the 2016 fiscal year results. As could be expected, analysts were concerned with the recent Acquisition, including the length of time it took to close the transaction. During the call, defendant Neidorff explained that while the Acquisition took longer than expected to close, there were "no surprises."

104.    During the call, an analyst with Goldman Sachs, asked about Health Net's ACA exchange membership and the risk corridor from that business. In response, defendant Baldwin touted Health Net's business in California, stating it was very similar to Centene's practices. They stated:

[Analyst]: Thank you for squeezing me in. I had a question on the -- and I know you don't want to break it out, but when you are starting with this Health Net --

large book at Health Net ACA exchange membership, is it profitable now? And was it profitable when you exclude the risk corridor from that business? Or do you have to do something to get it to profitability? And what level of profitability is that? Because I assume it is somewhat less than what Centene has realized.

[Defendant Baldwin]: This is Rone Baldwin. In aggregate, the exchange business at Centene -- excuse me, at Health Net has been profitable. The one area of challenge with respect to the exchange business at Health Net has been Arizona. And Health Net did take actions with respect to this open enrollment period to make changes in the product line-up and the pricing for Arizona to be able to get that back on track.

But California, they pursue a strategy very similar to Centene's strategy in terms of tailored narrow networks with a focus on the subsidized population. That has worked well for them. They are seeing results in line with what we've seen on the exchanges. This does -- this is a view that also takes into account the risk corridor with respect to not booking any receivables for it going forward.

105.    When defendant Neidorff presented at the UBS Global Healthcare Conference on May 24, 2016, the Acquisition was again a topic of discussion. A UBS analyst specifically asked for commentary on how Health Net was doing compared to expectations. The analyst also asked whether "there [have] been any surprises or challenges or positives, negatives, or things you can highlight?" In response, defendant Neidorff stated that even though the Acquisition recently closed "we were just implementing things we've been planning for nine months" and that "I think it's all been where we expected ... it's been fine." Defendant Neidorff continued that "our mentality is you really start integration when you're doing diligence even before you sign the contract." Defendant Neidorff also addressed Health Net's balance sheet, stating that the risk court orders that Health Net was carrying were "[a]ll written off."

106.    On June 17, 2016, the Company held its 2016 Investor Day. At the Investor Day, defendant Neidorff presented about the Company's "Strategic Overview." The number one "Objective" according to defendant Neidorff was "Health Net Integration," which was supposedly "on Track or Ahead of Schedule." In discussing this integration, defendant Neidorff's

- 41 -

presentation described Centene as applying its reserve methodologies to Health Net's book of business. The presentation slide stated:



107.   Defendant Schwaneke then provided a "Finance Update" on the Company. During the presentation, defendant Schwaneke stated that there was a "consistent reserving methodology" for Health Net. Defendant Schwaneke explained that "[w]e ensure the adequacy of medical claims reserves by utilizing detailed reserve calculations by market and product that are reviewed by multiple levels within the finance department.   We get two independent actuarial reviews each quarter and monitor prior-period development.   The key is applying a consistent reserving methodology."   On the Company's specific reserve levels, defendant Schwaneke stated that   they "have developed favorably" and that "[s]o far this year we have seen positive development of $226 million from our 2015 reserves."

108.   Defendant Schwaneke gave investors confidence in his statements by discussing and providing slides during his presentation on the visibility Centene had into Health Net's

finances and the speed in which the Company provided this financial information.  In particular, defendant Schwaneke stated that "[s]ince the acquisition we have faster visibility into financial information" and that "[o]n a monthly basis, Centene's finance team has been reviewing and monitoring the medical claims reserves and development."  Defendant Schwaneke also presented the following slides concerning Health Net's reserves:



and



109. Defendant Schwaneke's presentation highlighted that there were "[n]o unfavorable development[s] on the acquired Health Net medical reserves through May," which defendant Schwaneke substantially repeated during the presentation.  The presentation slide stated:



110.    Defendant Baldwin claimed that "we have a big focus in California in margins on both the individual and group commercial business as part of the 2016 plan." Defendant Baldwin also addressed the very areas that were problem issues for Health Net without ever discussing the substance abuse claims and Health Net's attempt to not pay these valid claims, instead stating: "[w]e're implementing some best practices of Centene in terms of claims and medical management with a particular focus on California" and that "we're investing to revitalize our products in the individual space including in the individual PPO product in California."

111.    During the question and answer portion of the Investor Day, analysts again focused on Health Net's reserves.  Defendant Schwaneke claimed that "we haven't seen any unfavorable development[s]."  Centene's Chief Information Officer claimed that: "[t]he March 24 reserve balance includes all prior activity" and "in total we haven't seen any development on anything prior to [March 24, 2016]."

- 45 -

112.    Also during the question and answer portion, defendant Schwaneke was asked about the Company's visibility into claims on Health Net policies.  Defendant Schwaneke stated that roughly two months after a merger, an acquiring company has "paid 85% of the claims that you ultimately think you're going to pay," so "two months out you have 85% of the claims already paid and out the door. ...In three months, it's over 90%" so that "give[s] you a flavor for how much information we had" regarding Health Net's claims.

113.    The above statements were improper.  To start, they omitted that Health Net's liabilities were materially understated due to the money-losing California substance abuse policies and that the Company would have to substantially increase its reserves to deal with these money-losing plans.  They also failed to disclose the improper actions that Health Net, both before after the Acquisition, was taking to downplay these losses.  Further, the statements failed to disclose that Centene knew about the issues of Health Net's money-losing insurance policies covering substance abuse and that it would attempt to rewrite and not pay on these policies.

114.    The Individual Defendants' statements also omitted to disclose "known trends or uncertainties" and "known uncertaint[ies] reasonably likely to have material future effects on [the company's] financial condition," concerning Health Net's material increased liabilities on its California substance abuse policies, as well as Health Net's illegal efforts to prevent payments to substance abuse treatment facilities and the efforts to redesign the flawed PPO product design.

## THE TRUTH IS SLOWLY REVEALED

115.    On July 26, 2016, Centene announced its results for the second quarter of the 2016 fiscal year.  In the press release, the Company stated that it was "mak[ing] progress on the fair valuation of the Health Net balance sheet" and that while there were "no unfavorable

development[s] on the medical claims liability," it "did increase reserves for medical claims primarily associated with disputed substance abuse treatment center costs." In addition, the Company announced that it "recorded premium deficiency reserves primarily associated with Arizona and the California individual PPO business." The press release included a $90 million increase in medical claims liability compared to the previous quarter.

116. The Company held an earnings conference call with analysts and investors that same day to discuss its quarterly results. During the call, defendant Neidorff reiterated that the Company "did increase reserves for medical claims associated with disputed substance abuse treatment center costs. Additionally, [Centene] recorded premium deficiency reserves primarily associated with Arizona and California individual PPO business."

117. Defendant Schwaneke explained during the call, that Centene "increased reserves by approximately $90 million during the quarter associated with disputed substance abuse treatment center claims." He also explained that the Company "recorded premium deficiency reserves of approximately $300 million representing the fair value of underperforming contracts for the period from March 24 through December 31, 2016." Defendant Schwaneke provided further explanation for the reserve increase, stating:

> The premium deficiency reserves are primarily associated with unfavorable expected performance in the following areas -- first, losses in the individual commercial business largely in California driven by increased utilization of substance abuse treatment facilities; second, unfavorable performance in the Arizona commercial business reflecting the unfavorable risk pool caused by the grandmothering of non-ACA compliant policies further compounded by the lack of risk corridor benefit; and third, unfavorable performance in the Medicare business primarily in Oregon and Arizona.

118. Trying to assuage investor concerns, defendant Schwaneke stated that the Company took steps to improve performance in California, including that Centene had "taken steps to mitigate the substance abuse treatment center costs in the individual commercial

business in California, including modifications to plan design." However, defendant Schwaneke did not reveal that these modifications were unilateral, that Health Net was not paying amounts owed to substance abuse treatment centers, and that Centene would eventually have to pay these amounts.

119. Analysts were immediately concerned with these revelations. The first question from an analyst at Barclays Capital focused on this very issue asking: "I just really want to understand what exactly is going on with those losses. $300 million seems like a pretty big number. That 50% or so of Health Net's pretax."

120. In response, defendant Schwaneke explained that the increase in liabilities was actually almost $400 million when taking into account the $90 million medical claims liability. Defendant Schwaneke stated:

> So there's a piece that's really from March 24 and prior and then there's the March 24 and into the future, right? And so the $90 million is what we added to the medical claims liability. As of March 24, that really is for prior issues, and then we have a component, which is also in the $300 million for I would say March 24 through the end of this year.

121. The Barclays Capital analyst followed up with his confusion on the amounts Health Net (and the Proxy Defendants) previously reported, stating: "But I guess I still question how does Health Net get away with not reporting -- what exactly was the dispute? They just weren't paying these claims and it turns out they had to?" Defendants dodged answering this question directly by saying the Company was involved in litigation over some of the substance abuse charges.

122. Speaking about the Health Net's California PPO policies, defendant Neidorff disclosed that "[t]here were major flaws in it...." Describing Health Net's legacy PPO plans, defendant Neidorff stated: "This is something we inherited. And it was prior to the 24th when those things were set." Defendant Neidorff stated that he was "personally ... involved in and

pushing and discussing" changes to the PPO and Centene had been "working with the states at the highest levels to redesign the PPO product."

123. During the call, defendants were able to explain that even though it was increasing reserves and liabilities, the Company would use "purchase accounting" to take a premium deficiency reserve ("PDR") to keep the massive increase in liabilities and reserves from affecting the Company's earnings. Instead, Centene would take a charge against the goodwill embedded in the Acquisition. However, what this also means is that the Company overpaid for Health Net, since its goodwill was inflated.

124. In addition, defendants admitted that if they had not taken the PDR, the Company's earnings would have been lower by $300 million. In particular, defendants Neidorff and Schwaneke had the following discussion with an analyst at Goldman Sachs:

> [Analyst]: …Does that mean that if you hadn't taken the PDR, does that mean that your earnings for that period would be by your estimate $300 million lower than what your guidance states?"

> [Defendant Schwaneke]: So what I would say is that the original creation of the PDR is embedded in goodwill on March 24 and then effectively that PDR amortizes throughout the year to absorb the losses on those products that we've identified and businesses we've identified.

> [Analyst]: Okay, the answer basically is yes to that question?

> \* \* \*

> [Defendant Schwaneke]: Yes.

125. In addition, during the conference call, defendant Neidorff revealed that he knew about the need to take this PDR for months. In particular, at the time the Acquisition closed, defendant Neidorff admitted that "we knew some of this was there. We knew it could be dealt with in purchase accounting." Defendant Schwaneke stated that the $300 million PDR "was based on information as of March 24."

126.   Following the Company's earnings conference call, in light of the substantial focus on the issue of the increased reserves and liabilities, Centene filed a Current Report on Form 8-K with the SEC on July 26, 2016.   In the Form 8-K, the Company detailed the breakdown of the $300 million premium deficiency reserve, explaining:

> In connection with the Company's second quarter 2016 earnings conference call on July 26, 2016, the Company discussed the fair value of the premium deficiency reserve of approximately $300 million recorded in connection with the Health Net acquisition. The fair value of the premium deficiency reserve is comprised of the following:
>
> - $125 million associated with the California commercial business, $50 million of which is associated with substance abuse treatment facilities. We have filed for a combination of price increases and benefit design changes including reductions in reimbursement for out of network services. We are in the final stages of approval with the California Department of Insurance, which will be concluded by the end of the third quarter of 2016.
>
> - $70 million associated with the Arizona individual commercial business. We will exit the entire individual PPO business, effective January 1, 2017. We are reducing our participation in the health insurance marketplace business to one county for 2017 and have taken significant rate actions.
>
> - $70 million associated with the Medicare business. The 2017 bids have been submitted and should return the business to profitability in 2017.
>
> - $15 million associated with the Arizona Medicaid business. We have fully transitioned this business to Centene's operating platform as of July 1, 2016, and we have taken appropriate actions to improve performance.
>
> - $20 million of other smaller items including the Arizona small group and Oregon individual business. We have filed for rate increases and taken other appropriate actions to address these for 2017.

127.   The next day, defendant Neidorff was interviewed by television personality Jim Cramer.  During the interview, defendant Neidorff stated that the California policies, the PPO, "had a bad product design" that Centene was "working very closely with the [California]

Department of Insurance" to fix.  Mr. Cramer asked, "How did you miss this one?" referring to the problems with the substance abuse policies and other Health Net problems.  Defendant Neidorff explained that "we didn't miss it," and continued that there were "some issues in California with the individual plan, there were problems in Arizona with the non-profitable business" and that "[w]e knew this when we bought it."  In fact, the Individual Defendants knew about these problems "before [the Acquisition] closed."

128.   Centene's market capitalization fell precipitously with the disclosure of these facts.  Between July 25, 2016 and July 27, 2016, Centene's market capitalization fell over $1.3 billion, more than 10%.

129.   However, even after this disclosure of the increased reserves and liabilities, the public was unaware of the wrongful actions Health Net was and had been taking and that the Individual Defendants were well aware of this wrongdoing.  On September 7, 2016, Centene's Senior Vice President, Finance and Investor Relations, Kroll, presented at the Wells Fargo Securities Healthcare Conference.  During his presentation, Kroll explained that Health Net "had a denied a lot of claims that we subsequently determined should be on the books that had a chance to—they were owed."  Kroll also explained that the California PPO, the Arizona individual businesses, and Medicare Advantage in Oregon that Centene received from Health Net "were all losing money in 2015."

130.   During that conference, an analyst at Wells Fargo Securities detailed the charges that Centene took, including the $90 million reserve and $300 million PDR, and stated: "So the simple math is to say that maybe Health Net's earnings really were overstated somewhat when [Centene] bought it."  Kroll did not dispute that characterization, instead stating that the Company had no regrets in buying Health Net.

131.    On September 13, 2016, defendant Neidorff participated in a presentation at the Morgan Stanley Global Healthcare Conference.   During that conference, defendant Neidorff admitted that the Individual Defendants knew of the issues at Health Net when the Company was buying it.  In particular, defendant Neidorff explained that the California PPO had "some design flaws that were just so obvious to those of us who have been doing it for a long time."  He continued, stating:

> A PPO is designed to give people an option to go out of network, but really it should be designed to encourage people to stay in network. [Health Net's California PPO policies] had none of that. There were no caps on maximum allowances. We had the most liberal – or Health Net had the most liberal PPO out there, which encouraged adverse selection. We knew that when we bought the company. We had done our homework.

Defendant Neidorff also explained that the Company knew about and was planning on dealing with Health Net's issues "when we announced [the Acquisition]."

132.    However, the public still remained unaware of the violation of the FCA occurring at Health Net, the magnitude of Health Net's overstatement of its income due to its illegal actions, or the magnitude of the efforts undertaken to hide Health Net's increasing liabilities and problems with its substance abuse policies.

133.    On February 21, 2017, Centene filed its Annual Report on Form 10-K for the 2016 fiscal year with the SEC.  In the Form 10-K, Centene revealed that it received a Civil Investigative Demand from the DOJ regarding Health Net's submission of risk adjustment claims to the CMS under parts C and D of Medicare.  The Company also stated that the Civil Investigation Demand was likely related to a federal whistleblower action that was filed under seal in 2011.

134.    Only through this mention in the Form 10-K would the ordinary reasonable investor know to look for any whistleblower actions against Health Net.  That search revealed

that on February 15, 2017, the DOJ filed a complaint in partial intervention against UnitedHealth and a number of its subsidiaries, including Ingenix and its successor Optum. The complaint detailed, among other things, the actions Ingenix and Optum took to inflate risk adjustment payments. The DOJ's intervention also unsealed an earlier complaint where a whistleblower revealed that Health Net agreed to Ingenix taking many of the same actions it used to increase risk adjustment payments for UnitedHealth. This was the first instance outside investors could piece together the puzzle of the FCA violations occurring at Health Net.

135. Then on June 23, 2017, the CDI filed an Order to Show Cause against Health Net. The Order to Show Cause explained that the CDI received "hundreds of complaints" from residential treatment centers and laboratories concerning Health Net's handling of claims for substance use disorder treatment in 2015 and 2016. Instead of paying these facilities back for the treatments and services provided, "Health Net paid claims ... by substituting a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility." In other words, Health Net paid treatment centers for a different service than the one actually provided.

136. The CDI was unequivocal in its condemnation of the substitution method put for by Health Net, and then Centene after the Acquisition. In particular, it stated "Health Net's payment under this methodology is improper and resulted in the underpayment and unfair settlement of claims." The CDI continued that the treatment centers and labs "provided services to insureds covered by the 2015 and 2016 individual market PPO policies expecting to be paid pursuant to those express terms of those policies. Health Net, however, did not pay pursuant to the terms of the policy, instead using an improper methodology not represented by the terms of the policy."

137.    The CDI explained that Health Net's actions violated California law, including the Unfair Competition Law and the Mental Health Parity and Addiction Equity Act of 2008. It was only after the CDI acted that Centene agreed to pay the amounts owed.

138.    It was only upon the CDI filing of the order to show cause that a reasonable ordinary investor would be aware of the actions that Health Net, and then Centene, was taking to prevent payment for services that it owed and therefore the steps Health Net was taking to inflate its business health at the time of the Proxy and the Acquisition.

## SALES BY THE INSIDER SELLING DEFENDANTS

139.    Rather than providing the market with correct information, the Insider Selling Defendants, defendants Neidorff, Goldman, Baldwin, Gephardt, and Schwaneke, used their knowledge of Centene's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Centene, defendants were privy to material, nonpublic information about the Company's true business health. In total the Insider Selling Defendants disposed of nearly 500,000 shares of Centene stock worth approximately $28 million, as shown in the following table:

| Insider Last Name | Transaction Date | Transaction Code | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| **NEIDORFF** | 12/10/2015 | F | 229,150 | $57.52 | $13,180,708.00 |
| Chairman of BoD (May 2004 - Present) | 12/10/2015 | F | 22,377 | $57.52 | $1,287,125.04 |
| President, CEO and a director (May 1996 - Present) | 12/11/2015 | F | 47,950 | $57.47 | $2,755,686.50 |
| | 12/12/2015 | F | 47,950 | $56.87 | $2,726,916.50 |
| | 12/31/2015 | G | 20,000 | $0.00 | $0.00 |
| | Total (Sales) | 0 | Total (Sales) | | $0.00 |
| | Total (Other) | 367,427 | Total (Other) | | $19,950,436.04 |
| | Total Disposed | 367,427 | Total Proceeds | | $19,950,436.04 |
| **GOLDMAN** | 10/29/2015 | S | 5,000 | $60.88 | $304,400.00 |
| Executive Vice President & Chief Administrative Officer (June 2007 - At least February 2017) | 12/9/2015 | F | 3,517 | $57.40 | $201,875.80 |
| | 12/10/2015 | F | 7,992 | $57.52 | $459,699.84 |
| | 12/11/2015 | F | 7,034 | $57.47 | $404,243.98 |
| | 12/22/2015 | S | 25,000 | $65.19 | $1,629,750.00 |
| | 12/30/2015 | G | 151 | $0.00 | $0.00 |
| | 2/9/2016 | F | 2,503 | $53.72 | $134,461.16 |
| | 2/12/2016 | F | 3,610 | $53.72 | $193,929.20 |
| | 3/23/2016 | S | 15,000 | $62.96 | $944,400.00 |
| | Total (Sales) | 45,000 | Total (Sales) | | $2,878,550.00 |
| | Total (Other) | 24,807 | Total (Other) | | $1,394,209.98 |
| | Total Disposed | 69,807 | Total Proceeds | | $4,272,759.98 |
| **BALDWIN** | 11/30/2015 | F | 4,795 | $58.72 | $281,562.40 |
| Executive Vice President, Markets (January 2016 - December 2016) | 12/9/2015 | F | 3,197 | $57.40 | $183,507.80 |
| Executive Vice President, Insurance Group Business Unit (December 2012 - January 2016) | 12/10/2015 | F | 9,590 | $57.52 | $551,616.80 |
| | 1/4/2016 | S | 6,000 | $64.68 | $388,080.00 |
| | 2/9/2016 | F | 2,276 | $53.72 | $122,266.72 |
| | 4/1/2016 | S | 6,000 | $60.87 | $365,220.00 |
| | 7/1/2016 | S | 6,000 | $71.00 | $426,000.00 |
| | Total (Sales) | 18,000 | Total (Sales) | | $1,179,300.00 |
| | Total (Other) | 19,858 | Total (Other) | | $1,138,953.72 |
| | Total Disposed | 37,858 | Total Proceeds | | $2,318,253.72 |
| **GEPHARDT** | 6/28/2016 | S | 8,910 | $68.02 | $606,058.20 |
| Director (December 2006 - Present) | 6/29/2016 | S | 7,000 | $70.00 | $490,000.00 |
| | Total (Sales) | 15,910 | Total (Sales) | | $1,096,058.20 |
| | Total (Other) | 0 | Total (Other) | | $0.00 |
| | Total Disposed | 15,910 | Total Proceeds | | $1,096,058.20 |
| **SCHWANEKE** | 12/9/2015 | F | 834 | $57.40 | $47,871.60 |
| Executive Vice President, CFO and Treasurer (March 2016 - Present) | 12/10/2015 | F | 1,668 | $57.52 | $95,943.36 |
| Chief Accounting Officer (September 2008 - March 2016) | 12/11/2015 | F | 1,752 | $57.47 | $100,687.44 |
| Corporate Controller (July 2008 - March 2016) | 12/22/2015 | S | 2,000 | $65.09 | $130,180.00 |
| Senior Vice President (December 2011 - March 2016) | 2/9/2016 | F | 896 | $53.72 | $48,133.12 |
| | 3/24/2016 | G | 300 | $0.00 | $0.00 |
| | Total (Sales) | 2,000 | Total (Sales) | | $130,180.00 |
| | Total (Other) | 5,450 | Total (Other) | | $292,635.52 |
| | Total Disposed | 7,450 | Total Proceeds | | $422,815.52 |
| | Total (Sales) | 80,910 | Total (Sales) | | $5,284,088.20 |
| | Total (Other) | 417,542 | Total (Other) | | $22,776,235.26 |
| | Total Disposed | 498,452 | Total Proceeds | | $28,060,323.46 |

140.   While in possession of material, nonpublic information, defendant Neidorff disposed over 367,427 shares of his personally held Centene stock, worth nearly $20 million. Defendant Neidorff's disposition of his stock came in the form of relinquishment to the Company in exchange for Centene paying his taxes.   Thus, defendant Neidorff effectively had the Company purchase its own stock from him for an inflated price.

141.   Defendant Goldman disposed of nearly 70,000 shares of her personally held Centene stock, worth over 4.2 million.  Defendant Goldman relinquished over 24,000 shares to the Company, worth almost $1.4 million, in exchange for Centene paying her taxes.  Thus, defendant Goldman effectively had the Company purchase its own stock from her for an inflated price.  Defendant Goldman also sold 45,000 shares of her personally held Centene stock for proceeds of almost $2.9 million.  While she sold this stock pursuant to a 10b5-1 trading plan, which is supposed to remove discretion from the selling executive, defendant Goldman's sales occurred almost immediately after entering the plan.  For instance, defendant Goldman sold 15,000 shares of Centene stock on March 23, 2016, barely a month after she entered into a 10b5-1 trading plan on February 22, 2016.  Similarly, she entered into a 10b5-1 trading plan on November 6, 2015, and then sold 25,000 shares a month and a half later on December 22, 2015. Defendant Goldman's dispositions and sales equal nearly 37% of the stock she held during the sales period.

142.   Defendant Baldwin disposed of nearly 38,000 shares of his personally held Centene stock, worth over $2.3 million.  Defendant Baldwin relinquished almost 20,000 shares to the Company, worth over $1.1 million, in exchange for Centene paying his taxes.  Thus, defendant Baldwin effectively had the Company purchase its own stock from him for an inflated price.  Defendant Baldwin also sold 18,000 shares of his personally held Centene stock for

proceeds of almost $1.2 million. While he sold this stock pursuant to a 10b5-1 trading plan, which is supposed to remove discretion from the selling executive, defendant Baldwin's sales occurred almost immediately after entering the plan. For instance, defendant Baldwin sold 6,000 shares of Centene stock on January 4, 2016, barely a month after he entered into a 10b5-1 trading plan on December 3, 2015. Defendant Baldwin's dispositions and sales equal over 24% of the stock he held during the sales period. In comparison, defendant Baldwin did not sell any stock and only disposed of approximately 5,000 shares during the same period immediately prior to the beginning of the improper statements.

143.   Defendant Gephardt sold almost 16,000 shares of his personally held stock between June 28 and 29, 2016. These sales are suspicious as they occurred barely a month after defendant Gephardt entered into a 10b5-1 trading plan on May 26, 2016. These stock sales represented 28% of Gephardt's Centene stock holdings. Further, defendant Gephardt did not sell any stock during the same period immediately prior to the beginning of the improper statements.

144.   Defendant Schwaneke disposed of 7,450 shares of his personally held Centene stock, worth over $422,000. Defendant Schwaneke relinquished over 5,000 shares to the Company, worth almost $300,000, in exchange for Centene paying his taxes. Thus, defendant Schwaneke effectively had the Company purchase its own stock from him for an inflated price. Defendant Schwaneke also sold 2,000 shares of his personally held Centene stock for proceeds of over $130,000.

## THE COMPANY REPURCHASES TENS OF MILLIONS OF DOLLARS' WORTH OF ITS OWN STOCK AT INFLATED PRICES

145.   In breach of their fiduciary duties to Centene, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, defendants issued, and caused the Company to issue, the above misleading statements. These statements artificially inflated the price of Centene's stock.

146.     When an employee's restricted stock units vest, the employee owes taxes on those stock units.  Further, when an employee exercises a stock option, there are costs associated with the exercise of the option, such as paying the exercise price.  Instead of incurring these costs, Centene allows employees to relinquish their stock.  The amount of stock that the employee relinquishes is based on Centene's stock price.  The greater the stock price, the less stock the employee has to relinquish.  In the case of relinquishing the stock for tax purposes, Centene has to then pay the actual taxes owed to the respective taxing authorities.  Centene pays that amount in cash, not stock.  The amount Centene pays is based on the value at the time of the relinquishment of the stock, therefore, even if its stock price goes down, Centene is on the hook for the cash payment to the government.  As a result, Centene is damaged in two ways when its stock price is inflated and an employee relinquishes stock to it.  First, the Company receives less stock than it should.  Second, the Company pays more taxes than it should and does not receive stock worth that corresponding amount.

147.     The expense to the Company from this program is substantial.  The Company accounts for the relinquishment of the stock as an expense in its financial statements, categorizing it as a repurchase of stock.

148.     In particular, the Company repurchased the following amount of stock:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost | Source | File Date |
|---|---|---|---|---|---|
| | | | | | |
| August 2015 | 3,429 | $68.71 | $235,607 | 10-Q | 10/27/2015 |
| September 2015 | 4,515 | $58.92 | $266,024 | 10-Q | 10/27/2015 |
| October 2015 | 8,959 | $57.77 | $517,561 | 10-K | 02/22/2016 |
| November 2015 | 10,759 | $59.95 | $645,002 | 10-K | 02/22/2016 |
| December 2015 | 754,235 | $57.46 | $43,338,343 | 10-K | 02/22/2016 |
| January 2016 | 13,205 | $63.71 | $841,291 | 10-Q | 04/26/2016 |
| February 2016 | 53,703 | $55.40 | $2,975,146 | 10-Q | 04/26/2016 |
| March 2016 | 299,561 | $62.13 | $18,611,725 | 10-Q | 04/26/2016 |

| April 2016 | 33,025 | $61.76 | $2,039,624 | 10-Q | 07/26/2016 |
|---|---|---|---|---|---|
| May 2016 | 20,177 | $57.74 | $1,165,020 | 10-Q | 07/26/2016 |
| June 2016 | 22,510 | $66.03 | $1,486,335 | 10-Q | 07/26/2016 |
| July 2016 | 17,452 | $70.76 | $1,234,904 | 10-Q | 10/25/2016 |
| **TOTAL** | **1,241,530** | | **$73,356,581** | | |

149.    Notably, the same Insider Selling Defendants mentioned above account for a substantial amount of the repurchased stock detailed in the table above.

## DAMAGES TO CENTENE

150.    As a result of the Individual Defendants' improprieties, Centene disseminated improper, public statements. These improper statements have devastated Centene's credibility as reflected by the Company's over $ 1.3 billion, or 10.4%, market capitalization loss.

151.    Centene's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Centene's current and potential customers consider Centene's ability to perform on agreed-upon contracts and rates. Businesses are less likely to do business with companies that renege on agreed-upon transactions and rates, as Health Net did before and after the Acquisition. In fact, according to reports, some substance abuse treatment centers have turned away potential clients due to them possessing Health Net insurance.

152.    Further, Centene's ability to raise equity capital or debt on favorable terms in the future is now impaired and it stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

153.    Centene is currently being sued by investors over their purchase of the Company's stock at inflated prices. Centene is expending a significant amount of money defending this action. Further, it has a substantial expense in the form of a judgment or settlement of the action.

154.    Further, as a direct and proximate result of the Individual Defendants' actions, Centene has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)    the overpayment for Health Net;

(b)    costs incurred from delaying payment for substance abuse treatments;

(c)    costs of overpaying for its stock at an inflated price; and

(d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Centene.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

155.    Plaintiff brings this action derivatively in the right and for the benefit of Centene to redress injuries suffered, and to be suffered, by Centene as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Centene is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156.    Plaintiff will adequately and fairly represent the interests of Centene in enforcing and prosecuting its rights.

157.    Plaintiff was a stockholder of Centene at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Centene stockholder.

158.    The current Board of Centene consists of the following eight individuals: defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, and Thompson. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

159.    Defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, and Thompson face a substantial likelihood of liability for violating section 14(a) of the Exchange Act and breaching their fiduciary duties by making improper statements in the Proxy.

160.    Defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, and Thompson also face a substantial likelihood of liability for violating section 10(b) of the Exchange Act by making the false and misleading statements that inflated the Company's stock price and then permitting or allowing the repurchase at these inflated prices.

161.    Defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, and Thompson face a substantial likelihood of liability for breaching their fiduciary duty by allowing Health Net to refuse payment to treatment centers.

162.    Defendants Eppinger and Roberts, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that it is required to review the Company's earnings release, financial information, and quarterly financial statements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to Centene's earnings guidance and financial and disclosure controls.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Eppinger and Roberts face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

163.    Defendants Gephardt and Neidorff disposed of their Centene stock under highly suspicious circumstances as described above.  Defendants Gephardt and Neidorff possessed material, nonpublic company information and used that information to benefit themselves.  These defendants disposed of this stock based on this knowledge of material, nonpublic company

information regarding Centene's reserves and liabilities and the impending decrease in the value of their holdings of Centene. Accordingly, defendants Gephardt and Neidorff face a substantial likelihood of liability for breach of their fiduciary duty of loyalty. Accordingly, any demand upon them is futile.

164.    Plaintiff has not made any demand on the other stockholders of Centene to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Centene is a publicly held company with over 172 million shares outstanding and thousands of stockholders;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Centene, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

167.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by defendants, defendants caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to defendants' false or misleading statements.  Defendants engaged in a scheme to defraud Centene by causing the Company to purchase of $73.3 million in shares of Centene stock at artificially inflated prices.

168.    Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Centene in connection with the Company's  purchases of Centene's stock during the period of wrongdoing.

169.    Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Centene stock, which were intended to, and did: (a) deceive Centene and its stockholders regarding, among other things, Health Net's reserves and liabilities; (b) Centene's and Health Net's efforts to deal with the poorly written Health Net plans that caused the spike in liabilities and need to record substantial additional reserves; (c) artificially

inflate and maintain the market price of Centene stock; and (d) cause Centene to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, defendants were in possession of material, nonpublic information regarding the above.

170.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the period of wrongdoing, as alleged above.

171.    As described above, defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to defendants or were so obvious that defendants should have been aware of them. Throughout the period of wrongdoing, defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

172.    Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Selling Defendants.

173.    As a result of defendants' misconduct, Centene has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

174.    Centene would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by defendants' false or misleading statements.

175. As a direct and proximate result of defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Centene stock during the period of wrongdoing. By reason of such conduct, defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

176. Plaintiff brings this claim within two years of his discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

### Against the Proxy Defendants for Violation of Section 14(a) of the Exchange Act

177. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178. The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy. The Proxy contained a proposal for the issuance of the common stock necessary to effectuate the Acquisition. In seeking stockholder approval of this proposal, the Proxy contained the numerous misleading statements described above concerning Health Net's business activities, health, and prospects.

179. By reasons of the conduct alleged herein, the Proxy Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of the Proxy Defendants' wrongful conduct, the Proxy misled and/or deceived its stockholders, who in turn voted in favor of the stock issuance which made the Acquisition possible.

180. The misleading information contained in the Proxy was material to the Company's stockholders in determining whether to approve the Acquisition. The proxy solicitation process in connection with the Proxy was an essential link in the stock issuance's ratification.

181.     Plaintiff, on behalf of Centene, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper approval of the Acquisition.

182.     Plaintiff brings this claim within one year of discovery of the facts necessary to state this claim and within three years of the violation.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

183.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.     The Individual Defendants owed and owe Centene fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe Centene the highest obligation of good faith, fair dealing, loyalty, and due care.

185.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.

186.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Centene has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

187.     Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

188.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

189.    As a result of the wrongdoing described herein, the Individual Defendants have caused Centene to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty, paying inflated prices for its own stock, and overpaying for Health Net.

190.    As a result of the waste of corporate assets, the Individual Defendants are liable to Centene.

191.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Unjust Enrichment**

192.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

193.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Centene.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Centene and through their sale or gift of Company stock at artificially inflated prices.

194.    Plaintiff, as a stockholder and representative of Centene, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

195.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Centene, demands judgment as follows:

A.     Against all of the defendants and in favor of Centene for the amount of damages sustained by the Company as a result of the defendants' violation of securities laws, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing Centene to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Centene and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.     a proposal to strengthen Health Net's controls concerning treatment of substance abuse, including policies covering the treatment of substance abuse and payment to facilities that treat substance abuse;

2.     a proposal to strengthen Health Net's controls over submissions to CMS;

3.     a proposal to strengthen the Company's controls over financial reporting;

4.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

5.     a proposal to strengthen Centene's oversight of its disclosure procedures;

6.     a provision to control insider selling; and

- 68 -

7.     a provision to permit the stockholders of Centene to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Centene has an effective remedy;

D.     Awarding to Centene restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January __, 2018

JOSEPH V. NEILL LAW OFFICE

JOSEPH V. NEILL #28472
5201 Hampton Avenue
St. Louis, MO 63109
Telephone: (314) 353-1001
Facsimile: (314) 353-0181
E-mail: neill5300@aol.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
JENNY L. DIXON
NICHOLE T. BROWING
ERIC M. CARRINO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

E-mail: brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
jdixon@robbinsarroyo.com
nbrowning@robbinsarroyo.com
ecarrino@robbinsarroyo.com

Attorneys for Plaintiff

1234681

<u>VERIFICATION</u>

I, Harkishan Parekh, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____1/18/2018_____

_____
HARKISHAN PAREKH