UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CARPENTERS PENSION FUND OF      )
ILLINOIS, et al., derivatively and on    )
behalf of the nominal defendant    )
Centene Corporation,    )
    )
            Plaintiffs,    )
    )
            v.    )      No. 4:18 CV 113 CDP
    )
MICHAEL F. NEIDORFF, et al.,    )
    )
            Defendants,    )
    )
and    )
    )
CENTENE CORPORATION,    )
    )
            Nominal Defendant.    )

## MEMORANDUM AND ORDER

On July 2, 2015, each of the boards of directors of Centene Corporation and

Health Net, Inc., approved a merger plan whereby, upon a series of transactions,

Health Net would effectively merge into and become part of Centene.  On

September 21, 2015, a joint proxy statement/prospectus issued to Centene and

Health Net stockholders regarding their required approval of the merger.  The

stockholders approved the merger at special meetings held October 23, 2015, and

the merger closed on March 24, 2016.  Centene did not disclose in the proxy

statement, however, or at any time before closing that Health Net had significant

ongoing financial problems and liabilities decreasing its value to Centene.  Upon public disclosure of these issues in July 2016, Centene's stock price fell by more than 8%, resulting in a loss of more than $1 billion in stockholder value.

Several Centene shareholders filed this derivative action against certain Centene directors and officers who issued and/or approved the joint proxy statement and proceeded with the merger despite Health Net's problems.  Plaintiffs claim that these directors and officers made or approved false and misleading statements in the September 2015 proxy statement and thereafter continued to make or approve false and misleading statements regarding the extent of Health Net's liabilities inherited by Centene in the merger.  Plaintiffs contend that, by this conduct, the directors and officers breached their fiduciary duties, caused Centene to violate federal securities laws, and were unjustly enriched.  Plaintiffs also allege that, armed with nonpublic information obtained during the merger process, certain directors and officers engaged in insider trading by selling or disposing of shares of Centene stock knowing that the price per share was artificially inflated at the time.

Defendants move to dismiss the action under Rule 12(b)(6), Federal Rules of Civil Procedure, arguing that plaintiffs have failed to state a claim upon which relief can be granted and, further, that plaintiffs have failed to adequately demonstrate futility of demand to excuse them from making the required demand upon the board before bringing this action.  Because plaintiffs have failed to set

forth particularized facts excusing a pre-suit demand as the law requires, I will

grant defendants' motion to dismiss.

## Background

Centene is a diversified, multinational health care corporation incorporated

in the State of Delaware.  Among other things, it sells health insurance policies in

the United States, including policies for Medicaid, Medicare Advantage, Medi-Cal,

and other products.  Through a series of mergers that ultimately closed on March

24, 2016, Centene obtained Health Net, which itself was an insurance company

that sold health insurance policies to individuals, families, and businesses; offered

behavioral health, substance abuse, and employee assistance programs; and

provided prescription drug services.  Health Net's business was concentrated in the

Western United States, with a significant presence in California.

In November 2014, Michael F. Neidorff, President and CEO of Centene,

reached out to Health Net's CEO, Jay Gellert, to discuss a possible combination of

their two companies.  These discussions continued, and executives from both

companies met in March 2015 to discuss a possible transaction.  After continued

discussions between Neidorff and Gellert, Neidorff informed Health Net on June 8,

2015, that Centene was interested in pursuing a transaction.  Neidorff thereafter

met with Centene's board of directors – then composed of himself as chairman,

Robert K. Ditmore, David L. Steward, John R. Roberts, Tommy G. Thompson,

Frederick H. Eppinger, Richard A. Gephardt, Orlando Ayala, and Pamela A.

Joseph – 

On July 1, the board

unanimously approved the merger and Neidorff publicly announced the deal on

July 2.

A joint proxy statement/prospectus issued to Centene's and Health Net's

respective stockholders on September 21, 2015, detailing the considerations,

negotiations, rationales, and risks in pursuing and approving the merger.  The

proxy statement, signed by Neidorff, represented that the Centene board of

directors unanimously recommended that the stockholders vote for the proposed

transaction.  At special meetings held October 23, 2015, Centene's and Health

Net's respective shareholders voted to approve the merger.  Centene thereafter

continued in its course of due diligence, the board continued to meet on the

transaction, and the Centene/Health Net merger closed on March 24, 2016.

Plaintiffs allege that at the time the proxy statement issued in September

2015 and continuing through closing in March 2016, Centene's directors and

officers knew, but concealed from its shareholders, that Health Net had significant

financial problems, including that:

- Health Net had poorly designed and unprofitable insurance products in California;
- Health Net had exited the PPO market in Arizona because of its unprofitability;
- Health Net refused to pay claims from substance abuse treatment centers in California and Arizona, subjecting it to liability; and
- Health Net was potentially liable for over $900 million in unpaid taxes to California and was subject to future tax liabilities.

Plaintiffs also allege that Centene directors and officers should have learned

through due diligence that, in addition to the above issues, Health Net was under

investigation by the U.S. Department of Justice in a Medicare fraud scheme and

could thereby be exposed to additional liabilities.  In short, plaintiffs assert that

Health Net was not as profitable as Centene represented to its shareholders, and

that Health Net's undisclosed actual and potential liabilities assumed by Centene in

the merger were substantial.

Upon closing on March 24, 2016, Vicki B. Escarra, a former Health Net

director, joined Centene's board of directors.

On April 26, 2016, Centene filed its SEC Form 10-Q for the first quarter

ending March 31 and reported that valuation of nearly all of Health Net's assets

and liabilities had not been finalized and was incomplete.  Centene reported that

because of the timing of the closing, it could provide only preliminary estimates of

Health Net's assets and liabilities assumed as of the date of acquisition, and that

such accounting was therefore subject to change.  The Form 10-Q did not contain

any provision, explanation, or estimate related to premium deficiency reserves

(PDRs) that may be required for any Health Net liabilities.  ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████  The audit committee at that time was composed of

directors Roberts, Eppinger, and Escarra.

During an investor conference call on April 26, Neidorff discussed the

merger and reported to investors that there were "no surprises."  During this same

call, Centene officer K. Rone Baldwin (Executive Vice President, Insurance Group

Business Unit/Markets) reported to investors that Health Net's exchange business

had been profitable and that Health Net had pursued a strategy in California that

worked well for them.  At an investor conference held May 24, Neidorff assured

Centene investors that the merger process was "fine" and was "where we

expected," and that development of reserves "in the 90's" was "fine."  And during

investor day on June 17, Neidorff and Centene officer Jeffrey A. Schwaneke

(Chief Financial Officer, Executive Vice President, and Treasurer) reported that

there was "no unfavorable development" on Health Net's reserves, that the

reserves issue had found a "comfortable bed" and was "behind us," and that

shareholders need not be concerned.

In the meanwhile, on May 31, 2016, the California Department of Insurance announced that it had opened an inquiry into Health Net's cessation of or delayed payments to substance abuse treatment centers in California and Arizona. Industry press had reported in January 2016 that Health Net had suspended such payments pending its own initiated audit of treatment centers and their claims. In June and July 2016, groups of treatment centers in California and Arizona sued Health Net seeking over $200 million in unpaid claims.

On July 26, 2016, Centene released its second-quarter financial results, which disclosed $390 million in reserves for Health Net's increased liabilities, including for substance-abuse-treatment-center claims and cost trends relating to poor policy design involving several healthcare products in several States. Upon public release of this information, Centene's stock price fell more than 8%, amounting to a loss of over $1 billion in stockholder value. Neidorff later admitted that Centene knew of Health Net's problems prior to the merger.

At various times between shareholder approval of the merger in October 2015 and public disclosure of increased reserves on July 26, 2016, Neidorff, Gephardt, Baldwin, Schwaneke, and another Centene officer, Carol E. Goldman (Executive Vice President and Chief Administrative Officer), sold or disposed of several thousand shares of Centene stock, worth over $28.1 million in total.

## The Operative Complaint

Shareholder Harkishan Parekh filed this derivative action in January 2018.

Shareholders Laura Wood and Peoria Police Pension Fund filed a separate but

similar action in March 2018,[1] and shareholders Carpenters Pension Fund of

Illinois and Iron Workers of Local 11 Pension Fund filed a separate derivative

action in December 2018.[2]  After I consolidated the three cases, the shareholder-

plaintiffs filed a Verified Consolidated Amended Stockholder Derivative

Complaint ("amended complaint") in February 2019, which is the operative

complaint presently before the Court.

<u>The Defendants</u>

Inside-director Neidorff is named as a defendant in the amended complaint,

as well as outside-directors Ditmore, Steward, Roberts, Thompson, Eppinger,

Gephardt, and Ayala.  Plaintiffs collectively refer to these eight directors as the

"Proxy Defendants" because they were directors when the proxy statement issued

in September 2015.  Although Joseph was also an outside director at the time,

plaintiffs do not name her as a defendant in the amended complaint.  Escarra, who

was a Centene director from March 2016 to March 2017, is named in this action as

a defendant as well but is not given the "Proxy Defendant" moniker since she

---

[1] *Wood, et al. v. Neidorff, et al.*, Case No. 4:18CV393 CDP (E.D. Mo.).

[2] *Carpenters Pension Fund of Ill., et al. v. Neidorff, et al.*, Case No. 4:18CV2085 RLW (E.D. Mo.).

joined the board after the proxy statement issued.

Also named as defendants are Centene executive officers Schwaneke, Baldwin, and Goldman.  Because plaintiffs allege that these officers, along with Neidorff and Gephardt, unlawfully sold or disposed of shares of Centene stock with insider information, they refer to these five defendants collectively as the "Selling Defendants."

Centene Corporation is named as a nominal defendant.

The Claims

In Count 1 of their five-count amended complaint, plaintiffs assert that the Proxy Defendants violated § 14(a) of the Exchange Act by negligently issuing, causing to be issued, and participating in the issuance of materially false and misleading statements to stockholders in the September 2015 joint proxy statement regarding Health Net's and Centene's business activities, operations, finances, and prospects; and by incorporating certain of Health Net's SEC filings into the September 2015 proxy statement, which was misleading in that such incorporation failed to disclose Health Net's less profitable business, increasing liabilities, and risk from tax liabilities.  Plaintiffs allege that as a result of the Proxy Defendants' conduct, the proxy statement misled and/or deceived Centene stockholders who voted in favor of the merger.

Count 2 alleges that all defendants breached their fiduciary duties of good

faith, fair dealing, loyalty, and due care by allowing the merger to proceed based on inadequate due diligence and flawed process that caused Centene to overpay for Health Net's business, by disseminating a false and misleading joint proxy, and by allowing Centene to issue materially false and misleading information concerning its business and Health Net's finances.

In Count 3, plaintiffs allege that by concealing the problems and risks associated with Health Net's business, by issuing false and misleading financial statements in violation of Generally Accepted Accounting Principles (GAAP), and by making false and misleading SEC filings, all defendants breached their fiduciary duties of loyalty, good faith, and candor, causing Centene to violate its disclosure obligations under the Securities Act of 1933 and the Securities Exchange Act of 1934.

Count 4 alleges that the Selling Defendants were in possession of proprietary, nonpublic information concerning Centene and Health Net's business, financial condition, and regulatory issues and used such information for their own benefit when they sold or otherwise disposed of Centene stock prior to July 2016 when the stock price was artificially inflated.

Finally, in Count 5, plaintiffs assert that all defendants were unjustly enriched by their receipt of compensation and remuneration and/or insider trading of Centene stock given that defendants obtained these benefits while breaching

their fiduciary duties owed to Centene.

Plaintiffs contend that demand on Centene's board of directors to pursue litigation on these claims would have been futile and that pre-suit demand is therefore excused. Defendants argue that plaintiffs fail to plead demand futility with the required particularized facts, thereby requiring dismissal of the amended complaint.

## Legal Standards

In determining a Rule 12(b)(6) motion to dismiss, I must consider the factual allegations of the amended complaint as true and draw all reasonable inferences in favor of the plaintiffs. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). I must disregard, however, conclusions that are not supported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Brehm v. Eisner*, 746 A.2d 244, 249 (Del. 2000). In addition to the amended complaint, I may consider materials necessarily embraced by the complaint and materials that are part of the public record, without having to convert the motion to dismiss to one for summary judgment. *Humphrey v. Eureka Gardens Pub. Facility Bd.*, 891 F.3d 1079, 1081 (8th Cir. 2018); *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002). Materials "necessarily embraced" include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the

- 11 -

pleading." *Ryan*, 889 F.3d at 505 (internal quotation marks and citations omitted).

In addition, "public filings required to be filed with the SEC, [can be] considered

on a motion to dismiss." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.,*

270 F.3d 645, 663 (8th Cir. 2001).  With their respective briefs on defendants'

motion, both sides have submitted numerous exhibits that fall within the

parameters set out above, and neither side has objected to the other's submission.  I

have considered these materials in conjunction with the allegations in the amended

complaint in determining the motion to dismiss.

Generally, a complaint that pleads facts plausibly stating a cause of action

and gives the defendant fair notice of the claim and the grounds upon which it rests

is sufficient to withstand a Rule 12(b)(6) motion to dismiss.  *Twombly*, 550 U.S. at

555; Fed. R. Civ. P. 8(a).  But Rule 23.1 of the Federal Rules of Civil Procedure

"imposes a heightened pleading standard on complaints in derivative actions."

*Gomes v. American Century Cos.*, 710 F.3d 811, 815 (8th Cir. 2013).  "It requires

that the plaintiff 'state with particularity . . . any effort by the plaintiff to obtain the

desired action from the directors or comparable authority' and 'the reasons for not

obtaining the action or not making the effort.'"  *Id.* (quoting Fed. R. Civ. P.

23.1(b)(3)).  The failure of plaintiffs to make a demand or a particularized showing

of why such demand was futile constitutes grounds for dismissing a derivative

complaint under Rule 12(b)(6).  *Ji v. Van Heyningen*, No. CA 05-273 ML, 2006

- 12 -

WL 2521440, at *2 (D.R.I. Aug. 29, 2006).

Because Centene is a Delaware corporation, I apply Delaware law in determining whether plaintiffs have stated sufficient facts with requisite particularity to satisfy Delaware's demand requirement, or their reasons excusing them from making the required demand. *Cottrell on behalf of Wal-Mart Stores, Inc. v. Duke*, 829 F.3d 983, 989 (8th Cir. 2016) (law of state of incorporation provides substantive law on demand requirement). Because the shareholder-plaintiffs here assert demand futility, they must "comply with stringent requirements of factual particularity that differ substantially" from notice pleadings otherwise permitted, *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007), and plead particularized facts suggesting that the current directors are incapable of making an impartial decision in response to a demand regarding litigation. *Marchand v. Barnhill*, 212 A.3d 805, 816 (Del. 2019); *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984). "Vague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand." *In re INFOUSA*, 953 A.2d at 985.

For purposes of examining plaintiffs' claim of demand futility, I look to Centene's board of directors as it existed at the time plaintiffs filed the amended complaint in February 2019 to determine whether a majority of that board could have impartially considered a demand. *Cottrell*, 829 F.3d at 989. The board at that

time (*i.e.*, the "current" board) had nine directors:  defendants Neidorff, Ditmore,

Steward, Roberts, Thompson, Eppinger, Gephardt, and Ayala, and non-defendant

Jessica L. Blume.  For the following reasons, the amended complaint does not

plead facts with sufficient particularity excusing pre-suit demand on the current

board of directors.  I must therefore grant defendants' motion to dismiss on this

basis.

## Discussion

The decision whether to initiate or pursue a lawsuit on behalf of a

corporation is generally within the power and responsibility of the company's

board of directors.  8 Del. C. § 141(a).  Therefore, a shareholder may prosecute a

derivative suit only where either 1) the shareholder has demanded that the directors

pursue a corporate claim and the directors have wrongfully refused to do so, or 2)

where demand is excused because the directors are incapable of making an

impartial decision regarding whether to institute such litigation.  *Stone ex rel.*

*AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006).  "The

purpose of the demand requirement is not to insulate defendants from liability;

rather the demand requirement and the strict requirements of factual particularity . .

. 'exist to preserve the primacy of board decisionmaking regarding legal claims

belonging to the corporation.'"  *In re Citigroup Inc. S'holder Derivative Litig.*, 964

A.2d 106, 120 (Del. Ch. 2009) (quoting *American Int'l Grp., Inc., Consol.*

*Derivative Litig.,* 965 A.2d 763, 807-09 (Del. Ch. 2009)).

The shareholder-plaintiffs here did not make a demand upon Centene's board of directors to pursue this litigation.  They argue that such a demand would have been futile because eight of the nine directors on the current board are interested in this litigation as named defendants, benefited from the alleged misconduct, and face a substantial likelihood of liability.  Plaintiffs also argue that because these eight defendant-directors are so firmly entrenched on Centene's board, they are unable to be independent of each other or from management.

Under Delaware law, there are two tests for demand futility:  (1) the test articulated in *Aronson v. Lewis*,[3] when the majority of the board to whom the shareholders must make demand is composed of the same directors who engaged in the alleged misconduct; and (2) the test articulated in *Rales v. Blasband*,[4] when a majority of the board in place at the time of the challenged conduct has been replaced.  *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56 (Del. Ch. 2015); *see also McElrath v. Kalanick*, 224 A.3d 982, 990-91 (Del. 2020).  The *Aronson* test applies here.  *Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007) (*Aronson* test applies when at least one half of the board in place when complaint was filed approved the underlying challenged transactions).

_____

[3] 473 A.2d 805 (Del. 1984).

[4] 634 A.2d 927 (Del. 1993).

Under *Aronson*, a shareholder-plaintiff may demonstrate demand futility by pleading particularized facts that raise a reasonable doubt that 1) a majority of the board is disinterested or independent,[5] or 2) the challenged acts were the product of the board's valid exercise of business judgment. *Aronson*, 473 A.2d at 814; *Ryan*, 918 A.2d at 352. Under the first prong, a director is interested if s/he would face a "substantial likelihood" of personal liability for the conduct alleged in the complaint, *McElrath*, 224 A.3d at 991, or if s/he has or will receive a personal financial benefit from a transaction not equally shared by stockholders, *Rales*, 634 A.2d at 936. If plaintiffs show that any director was interested, I must then consider whether any other directors were not independent of that interested party. *McElrath*, 224 A.3d at 991. "Independence turns on whether 'the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'" *Id.* (quoting *Marchand*, 212 A.3d at 818). *See also Brehm*, 746 A.2d at 257. As to the second prong, plaintiffs must rebut the presumption that the challenged acts were a proper exercise of the directors' business judgment by pleading particularized facts that create a reasonable doubt that "the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence*, included consideration of all material

---

[5] Both the *Aronson* test and *Rales* test share this element.

information reasonably available." *Id.* at 259 (emphasis in *Brehm*).

I consider plaintiffs' assertion of demand futility with regard to each count of the amended complaint. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003).  If plaintiffs satisfy either prong of the *Aronson* test on a particular count, demand is excused as to that count. *Brehm*, 746 A.2d at 256.

A.    Disinterested and Independent Directors

Delaware law presumes that a corporation's board of directors is disinterested and independent. *Raul v. Rynd*, 929 F. Supp. 2d 333, 346 (D. Del. 2013).  To rebut this presumption, plaintiffs must allege sufficient particularized facts "director-by-director" to suggest "that a majority of the Board was incapable, due either to a material personal interest or domination and control, of objectively evaluating a demand" that the board assert the claims raised in this litigation.  *Id.*; *see also Brehm*, 746 A.2d at 257.  Because Centene's board was made up of nine directors when the amended complaint was filed, *Aronson*'s first prong requires plaintiffs to allege particularized facts raising a reasonable doubt that, as to each claim, at least five of those directors were disinterested and independent.  The amended complaint does not meet this heightened pleading standard.

First, plaintiffs do not plead any particularized facts that could raise a reasonable doubt that current board member Blume is a disinterested and

independent director as to any claim raised in this litigation.  I therefore consider her from the outset to be a disinterested and independent director as to all claims.

On the flip side, however, plaintiffs' allegations are sufficient to show that Neidorff is an interested director as to all claims.  The particularized facts show that he was the moving force behind the merger transaction and the conduit of all information presented to the board in seeking approval to pursue the merger.  And it is reasonable to infer from the facts alleged that he was the primary behind-the-scenes decisionmaker regarding significant issues – such as the initial determination to pursue merger, beginning due diligence, selecting and hiring the particular financial advisors ███████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████  He was the only director to sign the September 2015 proxy statement that issued to shareholders.[6] Moreover, Neidorff was Centene's primary spokesperson to the investors and to the public regarding the merger, both before and after closing; and he admitted to knowing of Health Net's financial and business problems before closing but did not disclose them to investors or the public – indeed, he made misleading statements regarding the same.  Finally, according to the amended complaint,

---

[6] Plaintiffs allege that all of the defendant-directors signed the proxy statement.  (ECF 47, ¶ 72.) But a review of the proxy statement itself (ECF 79-3) shows that Neidorff was the only Centene director to sign it.  The proxy statement provides the best evidence of its signatories.  Regardless, "[d]irectors' signatures . . . do not go very far in showing those directors' knowing acquiescence in misrepresentations."  *Ji*, 2006 WL 2521440, at *9.

Neidorff sold and/or disposed of Centene stock worth at least $20 million between the October 2015 shareholder vote approving the merger and the July 2016 public disclosure of liabilities assumed by Centene in the merger.  On the particularized facts alleged in the amended complaint, I consider Neidorff to be an interested director for purposes of all claims raised in this action.

I therefore turn to plaintiffs' demand futility allegations as they relate to the remaining directors.  Since Neidorff is an interested director throughout, plaintiffs' allegations must create – as to each claim – a reasonable doubt as to the disinterest or independence of at least four additional directors in order to satisfy *Aronson*'s first prong for demand futility.

      1.   *Count 1 – September 2015 Proxy Statement*

The amended complaint provides no details particularly identifying the specific conduct of any director other than Neidorff regarding the approval of the merger transaction or the contents of the proxy statement.  All that is alleged is that the directors were present at the board meetings and must have been aware ██████ ████████████████████████████████████████████████ ██████████████████ especially since the financial advisors admitted in their reports annexed to the proxy statement that their analyses were based on estimates, assumptions, and adjusted data given to them by Centene "management."  But merely asserting that the directors "must have known" is insufficient to create

reasonable doubt that the directors are disinterested.

The advisors' summaries of their work and the proxy statement itself repeatedly distinguish between Centene's "management" and the "board" (*e.g.*, ECF 79-3 at header pp. 73-74), suggesting that the two entities are distinct from each other and not interchangeable.  Therefore, it is not reasonable to infer, as plaintiffs urge, that it was the directors who collectively provided the advisors the allegedly incomplete information and adjusted data for their analyses.  Nor does the board's alleged consent for the advisors to use information provided by management support a reasonable inference that the directors themselves knew the data was flawed, especially since they were not the source of the information. Directors are presumed to have properly relied on expert advice.  *Brehm*, 746 A.2d at 261.  And plaintiffs do not allege particularized facts that, if proved, would show that the directors' reliance on the experts was not in good faith.  *See id.* at 261-62. Further, the proxy statement disclosed that the relevant analyses were based on estimates, assumptions, and adjusted data, cutting against plaintiffs' argument that the shareholders were misled by the information shared in that document.

Plaintiffs also assert that the directors were advised ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

- 20 -

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████   Weighing, evaluating, and taking risks in business define the role of a

board of directors.  *See In re House of Lloyd, Sales LLC*, No. 02-40208, 2008 WL

957663, at *7 (Bankr. W.D. Mo. Apr. 8, 2008).  And a review of the proxy

statement itself shows that, while the dual demonstration program was included

among several existing businesses that the merger was expected to strengthen, this

section of the statement also specifically cautioned that "there can be no assurance

that any of the potential benefits described above . . . will be realized," referencing

ten pages of risk factors the shareholders were advised to consider.  (ECF 79-3 at

header pp. 76-77, referencing header pp. 56-65.)  Providing these cautionary

statements relating to the identified programs and delineating specific risk

considerations, including risk to future performance of programs, likewise cuts

against plaintiffs' assertion that the proxy statement misled Centene's

shareholders.

Allegations that the directors were present at board meetings ████████

████████████████████████████████████████████

████████████ are not particularized enough to support plaintiffs' conclusory assertion that the directors themselves knew that the analyses were based on incomplete information and then knowingly approved this misleading information to be included in the proxy statement. *See In re Wal-Mart Stores, Inc. S'holder Derivative Litig.*, No. 4:12-CV-4041, 2015 WL 13375767, at *9 (W.D. Ark. Apr. 3, 2015), *aff'd sub nom. Cottrell on behalf of Wal-Mart Stores, Inc. v. Duke*, 829 F.3d 983 (8th Cir. 2016). Indeed, the amended complaint contains no particularized facts that would show, if proved, that a majority of the director-defendants were involved in the preparation or approval of the proxy statement. *Id.* Further, on the particular facts alleged, it cannot be said that the directors face substantial personal liability on the claim that the proxy statement was misleading, given that they ██████████████████████████████████████ ████████████████████ and the statement itself warned that all benefits may not be realized and several identified risks relating to these anticipated benefits were disclosed.

The particularized facts alleged in the amended complaint are therefore insufficient to create reasonable doubt as to the disinterest of the outside directors on the claim raised in Count 1 of the amended complaint. And merely being named as a defendant for approving a questionable transaction is insufficient to create a reasonable doubt that a director is disinterested. *See Aronson*, 473 A.2d at

815, 817.  Otherwise, "any plaintiff could circumvent the demand requirement by merely naming as defendants a majority of the corporation's board."  *Markewich ex rel. Medtronic v. Collins*, 622 F. Supp. 2d 802, 808 (D. Minn. 2009).  On the particularized facts alleged, only inside-director Neidorff is an interested director on the claim.

The particularized facts of the amended complaint likewise do not adequately demonstrate that any of the non-interested directors are either dominated by or so beholden to Neidorff or to Centene management that a reasonable doubt is created as to their independence for purposes of impartially considering a shareholder demand.  First, plaintiffs assert that seven of Centene's nine current directors have served on the board for at least twelve years and that board committees have been chaired by the same respective director for at least twelve years, thus showing that these directors will accede to the decisions of management, especially since it is management who re-nominates them to serve as directors year after year.  It is well established under Delaware law, however, "that the number of years that defendants have served on a board or multiple boards together cannot suffice as a basis to successfully plead a lack of independence for demand futility purposes."  *In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x 590, 595 (2d Cir. 2009) (citing *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 357 (Del. Ch. 1998), *rev'd on other grounds sub. nom, Brehm,* 746 A.2d at

244; *Beam*, 845 A.2d at 1049).  And being nominated or appointed to serve as director by someone in control is insufficient to reasonably doubt that director's independence, "because '[t]hat is the usual way a person becomes a corporate director.'"  *McElrath*, 224 A.3d at 995 (quoting *Aronson*, 473 A.2d at 816).

Plaintiffs also assert that these directors are not independent because they are personal friends and have longstanding personal and business relationships between themselves and Centene officers.  But this bare assertion of having a personal and business relationship, with nothing more, does not raise a reasonable doubt about the directors' independence, especially given the lack of any specific facts demonstrating that these relationships are particularly close or intimate. *Beam*, 845 A.2d at 1050-52 (to make a reasonable inference that a particular friendship casts doubt on a director's independence, specific factual allegations supporting the conclusion must be asserted).

Accordingly, as to Count 1 of the amended complaint, plaintiffs have failed to plead sufficient particularized facts to cast a reasonable doubt upon the disinterest or independence of any current Centene director other than Neidorff.

2.    *Count 2 – Fiduciary Duties*

Count 2 alleges that the defendant directors and officers breached their fiduciary duties of good faith, fair dealing, loyalty, and due care by continuing to conceal and mislead regarding Health Net's actual business performance,

- 24 -

prospects, and liabilities.  Plaintiffs specifically allege that ███████████

███████████████████████████████████████████████████████

███████████████████████████ , and that Neidorff later made

public statements to investors and others that everything was fine only to reveal

later that he knew all along that there were problems.  Plaintiffs claim that given

this and other publicly available information, the directors should have known

there were problems with the merger and done something about it.  For the

following reasons, the particularized facts in the amended complaint are

insufficient to create reasonable doubt as to the disinterest or independence of a

majority of the directors on this claim.

Centene's articles of incorporation contain an exculpation clause that

eliminates a director's personal liability to the corporation or its stockholders "for

monetary damages for breach of fiduciary duty as a director . . . to the fullest extent

authorized by the GCL [General Corporation Law of the State of Delaware]."

(Defts.' Exh. 10, ECF 79-12.)  Because the GCL authorizes exculpation clauses

that eliminate director liability for breach of duty of care, Del. Code tit. 8, §

102(b)(7), plaintiffs must plead more than negligence – even more than gross

negligence – to "get out from under an exculpated breach of the duty of care."

*McElrath*, 224 A.3d at 992.  Notably, liability cannot be limited under the GCL for

breach of duty of loyalty, bad faith acts or omissions, intentional misconduct or

- 25 -

knowing violations of the law, unlawful stock purchase or redemption, and actions

from which directors derive an improper benefit.  Del. Code tit. 8, § 102(b)(7).

But to show a substantial likelihood of personal liability on such claims, plaintiffs

must plead with particularity that the directors "acted with scienter, meaning they

had actual or constructive knowledge that their conduct was legally improper."

*McElrath*, 224 A.3d at 991 (internal quotation marks and citations omitted).

> In other words, directors are liable for subjective bad faith when their conduct is motivated by an actual intent to do harm, or when there is an intentional dereliction of duty, a conscious disregard for one's responsibilities.  Pleading bad faith is a difficult task and requires that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting.

*Id.* at 991-92 (internal quotation marks and citations omitted) (emphasis added).

Plaintiffs' allegations of scienter must be supported by facts that "plead with

particularity the specific conduct in which each defendant 'knowingly' engaged, or

that the defendants knew that such conduct was illegal."  *Wood v. Baum*, 953 A.2d

136, 142 (Del. 2008).  Conclusory statements that a director acted in bad faith are

not enough.

The factual assertions in the amended complaint are insufficient to suggest

that the directors acted in bad faith in continuing to move forward with the Health

Net merger.  Plaintiffs allege only that the directors knew or should have known of

Health Net's actual status, the risks of continuing with the merger, and

management's corresponding concealment because 1) ███████████████

- 26 -

███████████████████████████████ 2) their general roles as directors impute such knowledge to them, and 3) due diligence would have disclosed the issues if done properly.  Plaintiffs contend that the availability of information regarding Health Net's history and practices put the directors on notice of significant risks to Centene in pursuing the merger, thus demonstrating the directors' bad faith in allowing the merger to proceed.

"A showing of bad faith in the context of demand excusal is a high hurdle, and essentially requires the plaintiff[s] to demonstrate *intentional* wrongdoing by the board."  *McElrath*, 224 A.3d at 993 (emphasis added).  The facts alleged in the amended complaint and related materials do not support a reasonable inference that the directors knew the extent of Health Net's specific liability risks that Centene would inherit *and* intentionally ignored them in order to do harm or in conscious disregard of their duties to the company and its investors.  ██████████
████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████
████████████  While plaintiffs contend and an arguable inference can be made that the board should have done more and could have dug deeper, it is not reasonable to infer from the facts alleged that its failure to do so was an *intentional* dereliction of

its responsibilities amounting to bad faith.  *Id.* at 993-94.  "It is not enough to

allege that the directors should have been better informed."  *Id.* at 993.

The amended complaint simply does not plead sufficient particularized facts

that, if proved, would show that a majority of Centene's current directors acted

with scienter in their alleged failure to meet their duties of loyalty and good faith

owed to Centene and its investors.  *McElrath*, 224 A.3d at 991.  Board approval of

a flawed transaction is an insufficient basis to infer culpable knowledge or bad

faith on the part of individual directors.  *Id.* at 994; *Wood*, 953 A.2d at 142.

To the extent plaintiffs assert additional facts against Roberts and Eppinger

that may support a reasonable inference that their role on the audit committee

renders them interested for purposes of this claim,[7] it is well settled that committee

membership is an insufficient basis on which to infer knowledge.  *Wood*, 953 A.2d

at 142-43; *Desimone v. Barrows*, 924 A.2d 908, 942 (Del. Ch. 2007).  Indeed,

"Delaware law is clear that imputing knowledge to a director by virtue of his or her

position alone is insufficient for demand excuse purposes."  *Ji*, 2006 WL 2521440,

at *12 (citing *Guttman v. Huang*, 823 A.2d 492, 503 (Del. Ch. 2003)).  *See also*

*Markewich*, 622 F. Supp. 2d at 811 (applying Delaware law).  Regardless, even if

Roberts and Eppinger joined Neidorff in facing a substantial likelihood of personal

---

[7] Plaintiffs specifically allege that, as members of the audit committee, Roberts and Eppinger breached their duty to analyze, audit, and verify the financial information regarding the merger

liability on this claim, the interest of only three directors of a nine-member board does not create reasonable doubt that a majority of the board is disinterested. Especially where the particularized facts, if proved, do not show that the audit committee passed its information to the rest of the board. *See Cottrell*, 829 F.3d at 991. █████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████, the absence of specifically pled facts that the audit committee actually shared their knowledge with the rest of the board cannot support such an inference. *See id.* at 995.

　　　Plaintiffs also contend that there is a substantial likelihood the directors face personal liability on this claim because they failed to conduct appropriate monitoring and oversight of the merger process and the related statements made on behalf of Centene.  Delaware courts have recognized that a failure in oversight "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  To have a substantial likelihood of director liability on an oversight claim, "a plaintiff must plead the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed." *Desimone,* 924

A.2d at 940.  "[O]nly a sustained or systemic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish that lack of good faith that is a necessary condition to liability."  *In re Caremark*, 698 A.2d at 971.  Thus, liability under this theory is premised "on a showing that the directors were conscious of the fact that they were not doing their jobs."  *Guttman*, 823 A.2d at 506.

The particularized facts alleged in the amended complaint do not support an inference of a "sustained or systemic failure" of the board to exercise oversight of the merger process or of the dissemination of related information.  Plaintiffs have not pleaded that the directors, other than Neidorff and possibly Roberts and Eppinger, had actual knowledge of the allegedly misleading statements or of Health Net's particular issues that would eventually harm Centene's shareholders. To the extent plaintiffs argue that such knowledge must be inferred given that Centene management regularly reported to the board, as was its duty, Delaware courts have "consistently rejected" this logic, that is, "the inference that directors must have known about a problem because someone was supposed to tell them about it."  *Cottrell*, 829 F.3d at 995.  Plaintiffs also argue that public information related to Health Net's business performance, █████████████████████████ ███████, and lengthy discussions and hearings with California regulators put the director-defendants on notice that Health Net's practices created additional

substantial liabilities that could harm Centene in the merger, thereby rendering Centene's public assurances regarding the stability of the merger misleading and the directors liable for their failure to act.  But on the particularized facts alleged in the amended complaint, I cannot reasonably infer that the directors gleaned from these circumstances that something improper was afoot.

The pre-merger information relating to Health Net's cessation of payments to substance abuse treatments centers reported that Health Net took this action in conjunction with its audit of these centers.  Nothing in the amended complaint supports an inference that the directors knew of the questionable nature of this audit activity or the potential liability thereon until well after the merger closed. To the extent plaintiffs allege that ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

And other than alleging that the process of obtaining regulatory approval for the merger in California was lengthy, nothing in the amended complaint provides any reason why this fact should give pause to the directors or raise suspicion as to the propriety of the merger.  Accordingly, it cannot be said in the circumstances here that the alleged "warnings" pointed to conduct that was so "enormous and egregious" and posed a threat to Centene "so massive" that the board must have known about the impropriety.  *Cottrell*, 829 F.3d at 995.

"[R]ed flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer."  *Wood*, 953 A.2d at 143 (internal quotation marks and citation omitted).  Other than "they should have known," the amended complaint does not describe with particularity how red flags were "waved in the face" of any director other than inside-director Neidorff. ████

██████████████████████████████████████████████████████████

████████████████████████ it is not reasonable to infer that any potential harmful risk was displayed in such a way that a careful director would consciously know that harm to Centene was on the horizon despite public assurances otherwise. Regardless, from the facts alleged in the amended complaint, a reasonable inference cannot be made that the directors made "a *conscious* decision to take no action in response to red flags."  *In re Forest Labs, Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 396 (S.D.N.Y. 2006) (emphasis added); *see also Cottrell*, 829 F.3d at 993, 995 (knowledge of problem alone is insufficient to show scienter; *deciding* that no action was required is what matters).

To the extent plaintiffs contend that the directors' failure to learn of other substantial Health Net issues through the due diligence process shows the process itself to be inadequate, "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."  *Desimone*, 924 A.2d at 940.  Regardless,

even assuming that the process was inadequate, the amended complaint does not

plead with sufficient particularity that such inadequacy was the consequence of the

directors' *intentional* failure to conduct oversight or that they were conscious of

the process's inadequacy and deliberately failed to correct it.  Directors cannot be

liable, under a bad faith or duty of loyalty theory, for their failure to take corrective

or preventative action when they were unaware of the issues needing correcting or

preventing.  *Cf. Stone*, 911 A.2d at 369-70 (a failure to act in good faith can be

shown "where the fiduciary intentionally fails to act in the face of a known duty to

act, demonstrating a conscious disregard for his duties.").  Accordingly, on the

particularized facts alleged in the amended complaint, it cannot be said that a

majority of the directors face a substantial likelihood of personal liability for bad

faith execution of their oversight duties.

The allegations thus fail to raise a reasonable doubt that a majority of the

board is disinterested with respect to the claim raised in Count 2 of the amended

complaint.  And, as set out above, the facts alleged do not sufficiently suggest that

any non-interested director is so dominated by or beholden to any interested party

that a reasonable doubt exists as to their independence to impartially consider a

shareholder demand on this claim.  Plaintiffs have thus failed to meet *Aronson*'s

first prong of demonstrating demand futility as to this claim.

- 33 -

3.      *Count 3 – Federal Securities Laws*

Plaintiffs contend that defendants breached their duty of loyalty, good faith, and candor "by concealing the problems and risks concerning Health Net's business and by issuing false and misleading financial statements in violation of GAAP and false and misleading SEC filings," thereby causing Centene to violate its disclosure obligations under the Securities Act of 1933 and the Securities Exchange Act of 1934.[8]  Plaintiffs argue that demand is excused on this claim because the directors' conscious decision to allow Centene and Neidorff to violate securities laws through their false and misleading statements is not protected by business judgment.

I agree with plaintiffs that a board's conscious decision to allow its company to engage in illegal conduct, including a board's failure to act after being faced with evidence of illegality, excuses demand under *Aronson*'s business-judgment prong.  *See Louisiana Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 341 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013); *see also Strong ex rel. Tidewater, Inc. v. Taylor*, 877 F. Supp. 2d 433, 449 (E.D. La. 2012) (applying Delaware law).  Fatal to plaintiffs' claim of demand futility on this basis,

---

[8] In a separate federal securities class action arising from the Health Net merger, *Sanchez v. Centene Corp., et al.*, Case No. 4:17CV806 AGF (E.D. Mo.), the Court held that the alleged misstatements and GAAP violations in Centene's April 26, 2016, Form 10-Q and alleged misstatements in a quarterly earnings call that same day were not actionable under federal securities laws.  In light of that ruling, the parties here have stipulated that plaintiffs' claims that the April 26 statements give rise to liability under the federal securities laws are moot.  (ECF 76.)

- 34 -

however, is the amended complaint's lack of particularized facts supporting the allegation that the board acted (or failed to act) with *conscious* awareness of any alleged illegality. Moreover, as discussed more fully above, the amended complaint and related materials do not support a reasonable inference that the board failed to conduct its oversight duties in relation to the merger process or to the challenged statements regarding the merger.

First, to properly frame the demand futility issue as it relates to this claim, it is important to identify what plaintiffs allege regarding the directors' conduct. Other than Neidorff, plaintiffs do not allege that the individual directors themselves violated federal securities laws. Instead, they claim that the directors' conduct in permitting false and misleading statements to be made and their failure to disclose evidence of Health Net's actual problems and their impact on Centene's business caused Centene to violate federal securities laws.

In response to defendants' motion to dismiss, plaintiffs generally aver that the director-defendants face personal liability on this claim because they knowingly disseminated false information. But the amended complaint does not allege any particular fact detailing specific knowledge or conduct as to any director other than inside-director Neidorff and audit committee members Roberts and Eppinger. To the extent plaintiffs contend that board approval of SEC filings and financial statements render all directors responsible for the false and misleading

statements contained therein, plaintiffs must particularly allege the directors'

personal involvement in the process of preparing the company's statements in

order for me to infer that the directors had knowledge of the alleged improprieties.

*Ji*, 2006 WL 2521440, at *12 (citing *Guttman*, 823 A.2d at 498). Plaintiffs have

not done so here. And to impute knowledge to the outside directors that Neidorff's

public statements and statements to investors were false, plaintiffs need to make

other factual allegations connecting the outside directors to the day-to-day

workings of the corporation so that a reasonable inference can be made that they

knew the true state of affairs. *Id.* at *9 (citing *Dresner v. Utility.com, Inc.*, 371 F.

Supp. 2d 476, 494 (S.D.N.Y. 2005)). Plaintiffs have not done so here. Plaintiffs'

general assertions that the directors received routine updates and reports from

Centene management are insufficient to establish such knowledge. *Cottrell*, 829

F.3d at 995.

     The amended complaint does not plead particularized facts sufficient to

create reasonable doubt that a majority of the current board of directors faces a

substantial likelihood of personal liability on plaintiffs' claim that defendants'

conduct caused Centene to violate federal securities laws. And, as discussed

above, the facts alleged do not sufficiently suggest that any non-interested director

is so dominated by or beholden to any interested party that a reasonable doubt

exists as to their independence to impartially consider a shareholder demand on

this claim.  Accordingly, plaintiffs do not plead sufficient particularized facts casting reasonable doubt upon the disinterest or independence of a majority of Centene's current nine-member board of directors on the claim raised in Count 3 of the amended complaint.

    4.    *Count 4 – Insider Trading*

Because claims of insider trading do not challenge board action, *Aronson*'s second prong directed to the business judgment of challenged board action is inapplicable to this claim.  *Rales*, 634 A.2d at 933-34 (business-rule prong of *Aronson* not applicable where subject of derivative suit is not a business decision of the board); *Oswald on Behalf of Identiv, Inc. v. Humphreys*, 806 F. App'x 577, 579 (9th Cir. 2020) (insider trading is not action of the board).  Plaintiffs are thus required to allege particularized facts that create a reasonable doubt that the current board could have properly exercised its independent and disinterested business judgment in responding to a demand on the claim.  *Rales*, 634 A.2d at 934; *Oswald*, 806 F. App'x at 579 (citing *Beam*, 833 A.2d at 977; *Rales*, 634 A.2d at 934).

Plaintiffs argue that Neidorff's and Gephardt's sales and dispositions of Centene stock while in possession of insider information make demand on them futile.[9]  Other than asserting the personal and business relationships the other

---

[9] Although plaintiffs allege that officer-defendants Schwaneke, Baldwin, and Goldman also

directors have with Neidorff and Gephardt and with Centene management in general, plaintiffs offer no reason why demand on the current board's seven other directors would be futile regarding this claim. And, as discussed above, a bare assertion of a relationship is insufficient to demonstrate demand futility as to these other directors. Accordingly, even if Neidorff and Gephardt face a substantial likelihood of personal liability for insider trading and thus are interested directors for purposes of demand futility, this liability does not render demand futile on this claim because no other board member faces a similar threat or lacks the independence to properly consider a demand.

Plaintiffs have failed to plead sufficient particularized facts casting reasonable doubt upon the disinterest or independence of a majority of Centene's current nine-member board of directors on this claim of insider trading. Because they have failed to demonstrate that demand on the board would have been futile, I must dismiss the claim for failure to make a pre-suit demand.

5.   *Count 5 – Unjust Enrichment*

Finally, in Count 5, plaintiffs claim that all defendants were unjustly enriched by their receipt of compensation and remuneration while breaching their fiduciary duties and, in the case of the Selling Defendants, by benefiting from their

---

engaged in insider trading, they are not members of the board of directors. Their interest is therefore not relevant to the demand futility analysis on this claim except in the context of whether the particularized facts of the amended complaint sufficiently raise a reasonable doubt as to the other directors' independence from them.

insider trading of Centene stock.  Courts have rejected similar allegations that

recipients of compensation were unjustly enriched by receiving payment while

breaching their fiduciary duties.  *See In re Bank of N.Y. Mellon Corp. Forex*

*Transactions Litig.*, 991 F. Supp. 2d 457, 463-64 (S.D.N.Y. 2013) (finding no

reasonable doubt that the decision to pay allegedly wrongdoing officers was a valid

exercise of business judgment where the plaintiffs failed to allege the board was

aware of wrongful activity); *see also Central Laborers' Pension Fund v. Dimon*,

No. 14 Civ. 1041(PAC), 2014 WL 3639185, at *5 (S.D.N.Y. July 23, 2014)

("[T]he unjust enrichment claim fails because the 'only enrichment alleged by

plaintiffs consists of defendants' salaries, benefits, and unspecified bonuses.'")

(quoting *In re Pfizer Inc. S'holder Derivative Litig.,* 722 F. Supp. 2d 453, 465

(S.D.N.Y. 2010)).  And because plaintiffs fail to plead particularized facts

demonstrating a causal connection between defendants' alleged improper acts and

their compensation, the allegations of unjust enrichment fail as a matter of law,

thereby relieving the director-defendants of any substantial likelihood of personal

liability on the claim.  *See In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp.

2d at 466.  To the extent the claim is directed to benefits obtained from insider

trading, I have already determined that plaintiffs failed to create reasonable doubt

as to the disinterest or independence of a majority of directors on the claim.

Accordingly, the particularized facts alleged in the amended complaint are

insufficient to create a reasonable doubt as to the disinterest or independence of a majority of the current board regarding the challenged compensation levels and other benefits raised in Count 5.

B.      Business Judgment

Plaintiffs have failed to satisfy the first prong of *Aronson*.  I therefore turn to the second prong, which requires me to determine whether the amended complaint sets forth particularized facts creating a reasonable doubt that the board's decisions challenged by plaintiffs in this action were protected by the business judgment rule, that is, were they the product of a valid exercise of business judgment. *Brehm*, 746 A.2d at 256, 258.

To invoke the protection of the business judgment rule, "directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.  Having become so informed, they must then act with requisite care in the discharge of their duties."  *Aronson*, 473 A.2d at 812.  The rule operates "only in the context of director *action*.  Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act."  *Id.* at 813 (emphasis added).  And in some circumstances, "a conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule."  *Id.* To be actionable, the directors' process in making business decisions must be, at

the very least, grossly negligent.  *Brehm*, 746 A.2d at 259.

The informational component of the directors' decisionmaking does not mean that the board must be informed of every fact.  *Brehm*, 746 A.2d at 259. "The Board is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach." *Id*. (emphasis in *Brehm*).  The regularity of a board's decisionmaking process must be presumed.  *Id*.   Accordingly, the board here is presumed to have properly exercised its business judgment on its actions plaintiffs now challenge in this litigation.  *Id*. at 261.

████████████████████████████████████████████████████████

████████████████████████████████████████  the board made a

business decision to approve the merger transaction with Health Net.  And, ████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████  the board did not halt the

merger.  Plaintiffs disagree with the board's judgment as to both its approval of and its proceeding with the merger.  But plaintiffs' mere disagreement with the board's judgment is insufficient to impose liability, especially where the amended complaint and the materials embraced by it do not show that the board failed to consider the pertinent issues surrounding these matters on the information

reasonably available to it.  *Brehm*, 746 A.2d at 266.

On the particular facts alleged, plaintiffs may well prove that the board approved a flawed transaction and did not act to halt it ███████████████ ████████████████████████████████████████  But weighing, evaluating, and taking risks in business define the role of a board of directors. Allegations that the board here exercised its role imperfectly does not create a reasonable doubt that its decisions to approve the merger and continue with the process were the products of business judgment.  "To rule otherwise would invite courts to become super-directors, measuring matters of degree in business decisionmaking," an area in which we are "ill-fitted."   *Brehm*, 746 A.2d at 263, 266.  "Such a rule would run counter to the foundation of our jurisprudence."  *Id.* at 266.

## Conclusion

The particularized facts alleged in the amended complaint, when considered with the related materials submitted by the parties on defendants' motion, do not show that demand on Centene's board of directors was futile for purposes of pursuing this litigation.  I will therefore dismiss the amended complaint with prejudice for plaintiffs' failure to make a pre-suit demand as required by law.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' Motion to Dismiss Plaintiffs'

Verified Consolidated Amended Stockholder Derivative Complaint [77] is

**GRANTED**, and plaintiffs' Verified Consolidated Amended Stockholder

Derivative Complaint is hereby dismissed with prejudice for plaintiffs' failure to

make a demand upon Centene's board of directors before pursuing this derivative

action.

A separate Order of Dismissal is entered herewith.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 15th day of September, 2020.